**MY WORK ATTORNEY, LLC**
Amanda N. Martinez, Esq. (338141)                    *Counsel for Plaintiff*
1315 Walnut St Ste 801
Philadelphia, PA 19107
215-445-1482
amanda@myworkattorney.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY HUDGINS<br><br>　　　　Plaintiff,<br>　　v.<br><br>CITY OF PHILADELPHIA,<br>PHILADELPHIA FIRE DEPARTMENT,<br>MAYOR CHERELLE PARKER,<br>TIFFANY THURMAN,<br>FIRE COMMISSIONER JEFFREY<br>THOMPSON,<br>LOCAL 22 OF THE INTERNATIONAL<br>ASSOCIATION OF FIRE FIGHTERS,<br>MICHAEL BRESNAN,<br>JACQULYN MURPHY,<br>MARIAN FARRIS,<br>TABITHA BOYLE,<br>CHRISTINA QUINONES, *and*<br>DANA JACKSON<br><br>　　　　Defendants. | Civil Action No. _____<br><br><br>**Complaint and Jury Demand**<br>**Demanded** |

## <u>CIVIL ACTION</u>

Plaintiff, Anthony Hudgins, by and through his attorney, Amanda N. Martinez, Esq. at

My Work Attorney, LLC, bring this civil matter against Defendants, for violations pursuant to

Pennsylvania Whistleblower Law ("PWL" – 43 P.S. §§ 1421 *et. seq.*), 14th Amendment of the

United States Constitution (by and through 42 U.S.C. § 1983), Title VII of the Civil Rights Act

of 1964 ("Title VII" – 42 U.S.C. §§ 2000e, *et. seq.*), the Pennsylvania Human Relations Act

("PHRA" – 43 Pa. C.S. §§ 951 *et. seq.*)[1], Defamation, False Light, Tortious Interference, and Civil Conspiracy under Pennsylvania Common Law. Plaintiff seeks damages as set forth more fully herein.

## **INTRODUCTION**

Plaintiff Anthony Hudgins, a 31-year veteran of the Philadelphia Fire Department (PFD), brings this action following his retaliatory demotion. Around October 2024, Chief Hudgins uncovered overtime fraud activities involving paramedic Jacqulyn Murphy and payroll supervisor Marian Farris. To stop his review into their illegal conduct, the two women made threats to punish Chief Hudgins, spread lies that he was a sexual harasser, submitted bad-faith sexual harassment claims against him, and solicited other female employees to do the same. Chief Hudgins complained that the women's claims were in retaliation to his overtime review, but the City refused to investigate his complaints and refused to protect him from Murphy and Farris. Instead, the City placed Chief Hudgins on leave and spent around $30,000 to investigate the bad faith complaints against him.

Around July 2025, the City's internal investigation report into the sexual harassment accusations recommended that Chief Hudgins return to work. The investigation found no substantiated verbal misconduct and only that he had "hugged" coworkers, a behavior that his supervisor Fire Commissioner Thompson positively characterized to Chief Hudgins as "you were just being you." On September 9, 2025, the City's Office of Inspector General (OIG) confirmed that Chief Hudgins's accusers Murphy and Farris worked together to significantly defraud the City for at least two years, and stated that Chief Hudgins initially uncovered the

---

[1] Reference to the PHRA is made for notice purposes only. Plaintiff's administrative remedies are not fully exhausted for proceeding under such claims yet and are currently pending before the PHRC. Plaintiff will move to amend the instant lawsuit to include claims under the PHRA following administrative exhaustion, and such claims will mirror identically federal claims asserted hereinunder Title VII.

wrongdoing. After realizing the magnitude of this fraud by the two women, the City withheld the fraud findings from the public and demanded that Mr. Hudgins be disciplined. It demoted Mr. Hudgins exactly one month after the OIG's fraud findings, backdated his demotion by 10 days, cut his pay by about $75,000, and moved him to an isolated non-supervisory position. In further harm to Mr. Hudgins's reputation, the City publicly commented in the *Philadelphia Inquirer* that Mr. Hudgins was demoted, while intentionally withholding the OIG's findings that his accusers Murphy and Farris were proven fraudsters.

In support thereof, Plaintiff avers as follows:

## **THE PARTIES**

1.    Plaintiff Anthony Hudgins ("Plaintiff", "Chief Hudgins", or "Mr. Hudgins") is an adult individual residing at 526 N 53rd St, Philadelphia, PA 19131. He is currently employed by Defendants City of Philadelphia and Philadelphia Fire Department as an Incident Safety Officer.

2.    Defendant City of Philadelphia (the "City") is a municipality of the Commonwealth of Pennsylvania and it owns, operates, manages, directs, and controls the Philadelphia Fire Department, which employs Mayor Cherelle Parker, Tiffany Thurman, Jeffrey Thompson, as well as other individuals identified herein, who/whom are relevant and at all times were acting under color of state law, and operating pursuant to official policies, customs, and practices of Defendant. It's Litigation Department, Labor & Employment Unit is located at 1515 Arch St Floor 14, Philadelphia, PA, 19102.

3.    Defendant City of Philadelphia agreed, accepted, adopted, approved, acquiesced, and/or otherwise is bound by the actions, omission, and conduct of its officers, managers, supervisor, employees, and contractors, acting in accordance with his/her/their authority, including

Defendants Jeffrey Thompson, Mayor Cherelle Parker, Tiffany Thurman, Jacqulyn Murphy, and Marian Farris, Tabita Boyle, Christina Quinones, and Dana Jackson.

4.    Defendant Philadelphia Fire Department ("PFD") is a public sector organization that provides fire protection and emergency medical services to Defendant City of Philadelphia. Its headquarters is located at 240 Spring Garden Street, Philadelphia, PA 19123.

5.    Defendant Jeffrey Thompson (hereinafter referred to as "Defendant Thompson" or "Fire Commissioner Thompson"), is an adult individual employed by the PFD and the City, and at all times relevant, was a superior and supervisor to Plaintiff. This individual is being sued for both his individual capacity and official capacity.

6.    Defendant Mayor Cherelle Parker ("Defendant Parker" or "Mayor") is an adult individual employed by City as Mayor, the highest ranking official therein, and thus at all times relevant, was a superior to Plaintiff. This individual is being sued for both his individual capacity and official capacity.

7.    Defendant Tiffany Thurman ( "Defendant Thurman" or "Ms. Thurman") is an adult individual employed by City as the Chief of Staff for Mayor Cherelle Parker and directly reports to Mayor Cherelle Parker, and thus at all times relevant, was a superior to Plaintiff. This individual is being sued for both his individual capacity and official capacity.

8.    Defendant Local 22 of The International Association Of Fire Fighters ("the Union" or "IAFF Local 22"), is a labor union for professional firefighters, paramedics, EMTs, and officers of the Philadelphia Fire Department. Its main office is located at 415 N 5th St, Philadelphia, PA 19123.

9.    Defendant Michael Bresnan ( "Defendant Bresnan" or "Mr. Bresnan"), is an adult individual employed by Defendant IAFF, Local 22 as President. This individual is being sued for both his individual capacity and official capacity.

10.    Jacqulyn Murphy ("Defendant Murphy") is an adult individual, upon information and belief, resides at 1421 S. Swarthmore Ave, Swarthmore PA 19081, and was employed by Defendants PFD and the City from around 2009 until around September 2025 as a Paramedic.

11.    Marian Farris ("Defendant Farris") is an adult individual, upon information and belief, resides at 1509 Belmont Ave, Philadelphia, PA 19104 and was employed by the PFD and the City from around 2016 until around March 2025 as the Payroll Supervisor.

12.    Tabitha Boyle ("Defendant Boyle") is an adult individual, upon information and belief, resides at 1421 S. Swarthmore Ave, Swarthmore PA 19081 and is employed by Defendants PFD and the City as a Paramedic.

13.    Christina Quinones ("Defendant Quinones") is an adult individual, upon information and belief, resides at 634 Moredun Road, Huntingdon Valley, PA 19006, and is employed by Defendants PFD and the City as a Firefighter and aide to Deputy Fire Commissioner Carl Randolph (Car 3).

14.    Dana Jackson ("Defendant Jackson") is an adult individual and is employed by Defendants PFD and the City as the Professional Standards Officer.

## JURISDICTION AND VENUE

15.    Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

16.    The Court may properly maintain personal jurisdiction over Defendants because the Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction and comply with traditional notions of fair play and substantial justice, thus

satisfying the standard set forth by the <u>United States Supreme Court in International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

17.    The Court may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal law.

18.    The Court may also maintain supplemental jurisdiction over state law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 18(a) of the Federal Rules of Civil Procedure because they are sufficiently related to one or more claims within the Court's original jurisdiction that they form part of the same case or controversy.

19.    Venue is properly laid in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because Plaintiff is domiciled in this judicial district, Defendants are located in this judicial district and because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

20.    Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

21.    Plaintiff exhausted his administrative remedies under Title VII and the PHRA.

22.    Plaintiff timely filed a Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination, hostile work environment, and retaliation against Defendants the City and PFD.

23.    The Charge was assigned Charge Number 530-2026-02337 and was dual filed with the Pennsylvania Human Relations Commission ("PHRC").

24.    The EEOC issued Plaintiff a Dismissal and Notice of Rights ("Right to Sue") relative to the Charge and that Notice was dated January 5, 2026 for 530-2026-02337. Plaintiff received the notice by electronic mail.

25.    Plaintiff files the instant Complaint within ninety (90) days of the receipt of Plaintiff's Right to Sue in this matter.

26.    Plaintiff has exhausted Plaintiff's administrative remedies as to the allegations of this Complaint.

## MATERIAL FACTS

27.    Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

### Chief Hudgins Dedicates Over Three Decades to the PFD, Rising to First Deputy Commissioner (Car 2)

28.    Throughout Chief Hudgins's distinguished 31-year career, he performed his duties with the highest level of integrity and advanced through the ranks. On May 9, 1994, he started his career with the PFD as a Fire Fighter. On May 30, 2000, he was promoted to Lieutenant. On June 29, 2006, he was promoted to Captain. On June 3, 2011, he was promoted to Battalion Chief. On December 04, 2015, he was promoted to Deputy Chief.  On December 13, 2021, he was promoted to Deputy Commissioner (Car 3). Around June 2024, he was promoted to the position of 1st Fire Deputy Commissioner (Car 2).

29.    Throughout his tenure, Chief Hudgins was consistently praised for his integrity and hard work. He was well-regarded for his inquisitive nature and attention to detail. Chief Hudgins also served in specialized roles, including a tenure as the department's Special Investigations Officer. In this capacity, he handled complex internal matters and worked to maintain the professional standards of the force. He also represented the PFD in Fiscal Year budget testimonies, advocating for essential resources and safety upgrades.

30.    Chief Hudgins's base salary as 1ˢᵗ Fire Deputy Commissioner was $230,000 per year.

**Around October 2024, Chief Hudgins Begins to Investigate Potential Overtime Fraud Within the PFD and Reports His Initial Findings to Leadership**

31.    In or around October 2024, Theodore Quedenfeld, a Battalion Chief at the PFD, spoke with and texted Chief Hudgins regarding Defendant Murphy's compensation in which she received an abnormally high salary as a staff paramedic in the PFD. This discussion prompted Chief Hudgins to review Defendant Murphy and other PFD members' overtime payments.

32.    To establish a baseline for his investigation, Chief Hudgins performed a review of the Paramedic Continuous Quality Assurance (CQA) team's 2024 overtime data. He reviewed this data to establish whether Defendant Murphy's overtime payments were within the normal range for members of the Continuous Quality Assurance team or her overtime payments were disproportionately higher compared to her peers. As part of his review, Chief Hudgins initially requested the necessary paramedic staff information from Defendant Marian Farris (PFD Payroll Supervisor). However, Defendant Farris was reluctant to provide any substantive data. Thereafter, Chief Hudgins's staff independently analyzed overtime reports and weekly roll call sheets via the PFD SharePoint to flag any discrepancies and potentially excessive overtime hours.

33.    In or around October 2024, with the authorization of the PFD's Human Resources Director Princess Cencerae Ray, Chief Hudgins worked with City Administrative Officer Garrett Dietz to organize and analyze the CQA's 2024 overtime data. Mr. Dietz's analysis compared Defendant Murphy's overtime records against those of eight peer paramedics. The findings revealed that Defendant Murphy's payments were disproportionately higher than her peers. In 2024, excluding Defendant Murphy, the eight other paramedics averaged about 24 overtime payments in one year, nearly all backed by approved overtime sheets. Every overtime payment

required submission and approval of an overtime request form. In contrast with her peers, Defendant Murphy had 286 payments. Of the 286 overtime payments, 232 overtime request forms were missing. Based on the analysis, Defendant Murphy likely received 232 payments for unauthorized overtime in 2024.

34.    Defendant Farris, as the Payroll Supervisor, intentionally and knowingly processed the unauthorized overtime payments to Defendant Murphy.

35.    In or around October 2024, during a meeting with the highest levels of PFD leadership (Fire Commissioner Thompson, Deputy Commissioner Carl Randolph, Deputy Commissioner Martin McCall, and Assistant Deputy Commissioner Derek Bowmer) Chief Hudgins discussed his findings. He stated that he was looking into overtime fraud within the PFD and that he believed there was fraudulent activity, specifically naming Defendant Murphy, but needed more time to review the data before making a final call on whether it was an isolated incident or more widespread.

36.    In or around early November 2024, HR Director Ray informed Chief Hudgins that she had received a notice from the IRS regarding Defendant Murphy. The notice indicated that the City, in its capacity as the employer, had failed to withhold taxes for Defendant Murphy and stated that she did not qualify for a tax exemption. Per the IRS's directive for the City to notify the employee of this discrepancy, Chief Hudgins gave the letter to Defendant Murphy.[2]

---

[2] The Office of the Inspector General's (OIG) investigation later revealed that Defendant Farris manipulated Defendant Murphy's federal tax withholding exemptions. This allowed Defendant Murphy to receive a significantly higher net pay by circumventing required tax withholdings.

**Around November 2024, Defendant Murphy, Defendant Farris, and other
Female Employees File Bad-Faith Sexual Harassment Claims Against Chief Hudgins To
Stop His Overtime Review and Get Him Fired**

37.    In or around November 2024, before Chief Hudgins could interview Defendant Murphy

or Defendant Farris as part of his overtime review, both Defendants maliciously spread false

statements to others at work that Chief Hudgins was a sexual harasser. They boasted they would

ensure he would be punished.

38.    On or around November 4, 2024, a PFD employee (who reported to Chief Hudgins)

was standing outside near the PFD parking lot. The employee witnessed Defendant Murphy walk

outside and fall to her knees screaming and crying. Defendant Murphy's wife Tabitha Boyle

(also a paramedic at the PFD), walked outside and told Defendant Murphy to come back into the

building. As Defendants Murphy and Boyle walked back into the building, Defendant Boyle

yelled at the employee saying something like, "YOU BETTER HAVE A BACKUP PLAN

READY, BECAUSE HUDGINS IS GOING THE F*** DOWN AND GETTING KICKED

OUT OF HIS SPOT AND YOU'RE GOING THE F*** DOWN WITH HIM!"

39.    Defendant Murphy agreed with Defendant Boyle's aforementioned statements.

40.    In or around November 2024, Defendant Murphy and Farris gathered other female

employees, including but not limited to Defendants Boyle, Quinones, Jackson, to help them file

the bad faith sexual harassment claims against Chief Hudgins.

41.    In or around November 2024, employees witnessed Defendant Murphy trying to recruit

other females at work. Defendant Murphy approached one female employee at the PFD asking,

"Do you want to get in on this lawsuit?" Another female employee sitting nearby responded,

"What are you talking about?" Defendant Murphy responded something like "against Hudgins . .

. well if you want to get some money and get on this with us - for sexual harassment." Both

female employees in shock, immediately refused, stating that it was wrong what Defendant Murphy was trying to do to Chief Hudgins.

42.    Also, Defendant Quinones cold-called other female employees at work to find additional women to join in on their claims against Chief Hudgins.

43.    Defendants Murphy, Farris, Boyle, Quinones, and Jackson conspired to create a manufactured sexual harassment scandal and punish him as a male supervisor, effectively using the City's Sexual Harassment Prevention Policy to further their unlawful activities.

44.    Upon information and belief, the City and PFD had actual knowledge of Defendant Murphy's pattern of filing dubious harassment claims against male supervisors to avoid accountability and evade authority. This history includes prior complaints lodged against Station Captain Robert Taylor and Paramedic Emergency Services Chief Russell Bryant. Despite this, the City and PFD demonstrated deliberate indifference and failed to scrutinize Defendant Murphy's credibility. The City and PFD permitted Defendant Murphy's bad-faith accusations against Chief Hudgins to move forward.

**Around December 2024, Fire Commissioner Thompson tells
Chief Hudgins not to go back into the office and to work from home**

45.    In or around early December 2024, Chief Hudgins received a call from Fire Commissioner Thompson. On the call, Fire Commissioner Thompson told Chief Hudgins not to return to the office and to avoid PFD's headquarters until the investigation into the harassment allegations was complete. He was permitted to work remotely.

46.    This decision removed Chief Hudgins from the PFD premises and prevented his overtime review.

47.    On the same call, Chief Hudgins told Fire Commissioner Thompson that he was being retaliated against and that the women were fabricating sexual harassment accusations to destroy

11

his career and punish him for looking into the overtime fraud. In response, Fire Commissioner Thompson told Chief Hudgins not to come into the office and that hopefully the sexual harrassment investigation would not take long to complete.

48.    Despite Chief Hudgins's complaints of retaliation, Defendants the City, PFD and Fire Commissioner Thompson offered no protections to Chief Hudgins and did not open up an investigation regarding the women's retaliatory and harassing behavior against Chief Hudgins.

49.    Around early January 2025, Fire Commissioner Thompson called Chief Hudgins and told him that he could continue to work remotely but "don't make any decisions".

50.    In or around January 2025, Chief Hudgins submitted his initial findings of overtime fraud to the City's Office of Inspector General (OIG), led by Inspector General Alexander F. DeSantis. The OIG continued the investigation.

**Around <u>April 2025</u>, Defendant Farris Resigns from the PFD**

51.    On or around April 7, 2025, during the OIG's investigation into the overtime fraud, and while Chief Hudgins was still working remotely, Defendant Farris (payroll supervisor) resigned from the PFD. Her alleged reasons for resigning included anxiety, depression, toxicity within the department, hostile work environment from her staff within the payroll unit, her personal information given to outside sources for review, employees reviewing her income and sharing it with others, and having to be part of a harassment investigation.

52.    Upon information and belief, the real reason behind Ms. Farris's resignation was her awareness that she was being scrutinized by the OIG's investigation into her fraudulent activities alongside Defendant Murphy, thus Ms. Farris resigned before the PFD could fire her for gross misconduct.

53.    Her alleged reasons for resignation did not state or suggest that Chief Hudgins had ever harassed her or that she was resigning in order to avoid Chief Hudgins.

54.    Instead, Defendant Farris published false statements to the Philadelphia Inquirer that Chief Hudgins sexually harassed her.

### On May 6, 2025, Defendant Murphy and Defendant Farris Publish Their False Sexual Harassment Claims in The Philadelphia Inquirer, and IAFF Local 22 Falsely Implicates Chief Hudgins As A Serial Sexual Harasser

55.    On May 6, 2025, the Philadelphia Inquirer ("Inquirer") published an article titled "Harassment and Overtime Fraud Probes Collide at Top Levels of the Philly Fire Department."[3]

56.    Defendants Murphy and Farris made statements to the Inquirer to publicly and maliciously spread their false claims that Chief Hudgins was a sexual harasser. The cited "department staffer [who] said she was targeted in the overtime probe" was Defendant Murphy. The cited "second woman who recently quit the department" was Defendant Farris.

57.    In the article, Defendant Farris falsely "alleged that Hudgins demanded hugs, pulled her hair and unbuttoned his pants in her cubicle, telling her he needed to adjust his shirt."

58.    Defendant Farris also falsely "claimed he'd used intimidation tactics to pressure her to adjust timesheets for an aide".

59.    Defendant Farris also in a false or false impression manner stated "she quit her job to avoid him but feared speaking on the record now because she may seek to return to work at the department at some point."[4]

---

[3] See https://www.inquirer.com/news/philadelphia/philadelphia-fire-department-anthony-hudgins-investigation-20250506.html
[4] As stated earlier, Mr. Hudgins was about four months his remote work arrangement when Defendant Farris resigned. He had no contact with her while remotely working. Thus, it is highly unlikely that Defendant Farris resigned specifically to avoid Mr. Hudgins.

60.    Defendant Murphy also spoke to the Inquirer, repeating her false accusations against Chief Hudgins of " inappropriate comments and touching".

61.    Defendant Murphy also falsely told the Inquirer "she was targeted in the overtime probe in retaliation for her complaints against Hudgins."[5] She also falsely said that "her six-figure overtime haul was a result of accepting every extra shift available on her off-hours".

62.    Defendant Michael Bresnan, President of IAFF Local 22, also spoke to the Philadelphia Inquirer in a false or false impression manner saying that  "he'd heard of as many as a dozen workers with complaints against Hudgins".

63.     Defendant Bresnan's comments to the Inquirer about such dozen complaints, being cited in an article about sexual harassment claims against Chief Hudgins, gave a false impression that Chief Hudgins was a serial sexual harasser.

64.    Being perceived as a serial sexual harasser would be highly offensive to a reasonable person.

65.    Chief Hudgins reiterated his concerns to the Inquirer that he was being retaliated against for uncovering overtime fraud at the PFD. The City was aware of these statements yet still refused to investigate Chief Hudgins complaints against the women.

66.    Shortly after the Inquirer article, HR Director Ray called Chief Hudgins and told him that he was being placed on forced leave, and to stop his remote work.

**Around May 17, 2025, Defendant Murphy takes a vacation on a Norwegian Cruise and continues to fraudulently bill overtime while on the boat**

67.    Defendant Murphy's fraud continued even after the overtime scandal was published by the Inquirer. Around May 17, 2025, Defendant Murphy was on a Norwegian Cruise for vacation

---

[5] The OIG confirmed in its investigation report that the overtime probe happened *before* Defendant Murphy's complaints of sexual harassment against Mr. Hudgins.

and continued to fraudulently bill overtime. She also stated that she was going to get more women to testify against Chief Hudgins to further her unlawful acts.

### The City Spends about $30,000 To Investigate The Sexual Harassment Claims Against Chief Hudgins; Report is Produced Around July 2025

68.    The City spent about $30,000 in public funds to hire the law firm Campbell Durrant P.C. to investigate the sexual harassment claims by Defendants Murphy, Farris and other female employees.

69.    On or around February 2025, Attorneys Tiffany Allen, Esq. and Benjamin Patchen, Esq. at Campbell Durrant P.C interviewed Chief Hudgins, on behalf of the City. The interview was recorded.

70.    During the interview, Chief Hudgins remained truthful and denied all harassment accusations made against him.

71.    Chief Hudgins told the attorneys during the interview that the allegations made by the women were retaliatory. He cited the fraud investigation led by the City's Inspector General Alex DeSantis, involving Defendants Murphy and Farris. Chief Hudgins told the attorneys to speak with Inspector General DeSantis. The attorneys confirmed that they knew Mr. DeSantis. Chief Hudgins also provided the names of two employees that were solicited by Defendant Murphy to join her manufactured sexual harassment claims against him.

72.    The attorneys did not respond to Chief Hudgins complaints that he was being retaliated against by the women.

73.    Upon information and belief, the attorneys did not contact Attorney General DeSantis regarding Chief Hudgins's claims of retaliation. Also, upon information and belief they did not follow up with or interview the two witnesses Chief Hudgins identified.

74.     The City's investigation into the allegations against Chief Hudgins was discriminatory from its inception. This is shown when the women complained about Chief Hudgins, the City prioritized their complaint and proceeded with an investigation. Whereas, when the male Chief Hudgins complained about the women, the City did not prioritize his complaint and did not proceed with any investigation into his complaint.

75.     In or around July 2025, Campbell Durrant P.C's attorneys finalized its investigation report regarding the sexual harassment claims against Chief Hudgins. The City's Employee and Labor Relations Administrator Elizabeth Martin sent an official letter to the Fire Commissioner, attaching the investigation report. The letter said that, "[t]he investigation concluded the Respondent [Hudgins] engaged in physical conduct by hugging individuals in the workplace, which was found offensive or unwelcome." The report also said, "[t]he investigation did not substantiate the claim that the Respondent engaged in offensive or prohibited verbal conduct."

76.     Shortly after, in or around July 2025, Fire Commissioner Thompson called Chief Hudgins on the phone and said something positive like, "Good news! You're coming back to work. You were just being you." Chief Hudgins asked Fire Commissioner Thompson to flip to the last page of the internal sexual harassment investigation report and specifically tell him what the report recommended. Fire Commissioner Thompson responded, "they recommended you return to work."

77.     On the call, Fire Commissioner Thompson did not discipline, reprimand, or tell Chief Hudgins that the conclusion of the report was that he "hugged" other people.

78.     For about three months following the call with Fire Commissioner Thompson, the City, PFD and Fire Commissioner Thompson did not contact Chief Hudgins. They did not contact him regarding any violations of the City's Sexual Harassment Prevention Policy nor did they provide

any discipline warnings. Instead, Chief Hudgins continued to be on forced leave awaiting his return date as 1st Deputy Commissioner.

79.    In or around August 2025, a vacancy for Assistant Chief was posted. Mr. Hudgins was neither notified of the opening nor granted access to the application materials, because he did not have access to his work email. When he contacted HR Director Ray to inquire about the position, he was informed that the application period had already closed. Through this isolation, the City denied Mr. Hudgins a legitimate career advancement opportunity.

### On September 9, 2025, the OIG Produced a Report to the City and PFD concluding that Defendant Murphy significantly defrauded the City with unapproved overtime, with help from Defendant Farris

80.    On September 9, 2025, the City's OIG provided a detailed report to the City, the PFD, and Fire Commissioner Thompson that concluded Defendants Murphy and Farris worked together to defraud the City of Philadelphia with a significant amount of unearned compensation and other benefits. In summary, the report stated that Defendant Murphy received approximately $█████ of unjust overtime during a two-year period, and that Defendant Murphy consistently paid Defendant Farris about $██ via CashApp on a biweekly basis for at least six (6) months in 2024, likely to supply Defendant Farris with her share of the unearned money from their overtime scam. The report also stated that Defendant Farris manipulated Defendant Murphy's federal tax withholding status to exempt, which dramatically increased Defendant Murphy's take-home pay.

81.    The report also stated that Chief Hudgins initially identified Defendant Murphy and Farris's illegal wrongdoing, and that the matter was referred to the Office of Inspector General (OIG) for additional investigation around January 2025.

82.   The report also stated that the employment discrimination complaint against Chief Hudgins filed by IAFF Local 22 was in November 2024, after Chief Hudgins began his overtime review, and thus his overtime review preceded any complaint of discrimination.

83.   On or around early September 2025, as a result of Defendants Murphy's and Farris's fraudulent activity, the City implemented a new overtime review tool to allow department heads to monitor and review overtime trends in real time for employees who had overtime that exceeded 25% of their base salary.

84.   The report's findings and the City's implementation of new overtime tracking tools confirm that Chief Hudgins's report of wrongdoing was reasonable and in good faith.

85.   Upon information and belief, shortly after the OIG produced the report, a meeting was held with Fire Commissioner Thompson, the Mayor's Chief of Staff Tiffany Thurman, and other City leadership to discuss how to move forward with Chief Hudgins's employment.

86.   Upon information and belief, Ms. Thurman, acting from a direct order of Mayor Cherelle Parker, demanded that Chief Hudgins be terminated. Others in the meeting spoke out against her demands, saying that Chief Hudgins did nothing wrong and should not be disciplined. Despite the opposition, the City, Mayor Cherelle Parker, and Ms. Thurman expressed their intent to discipline Chief Hudgins. During or near after the meeting, they finalized its decision to demote Chief Hudgins.

**On September 15, 2025, the City begins preparing for Chief Hudgins's replacement, while keeping him on forced leave with no information regarding his return date**

87.   On September 15, 2025, about one week after the OIG report, Fire Commissioner Thompson released a General Memorandum to Officers and Members of the PFD, stating that Deputy Chief of Logistics Carl W. Randolph Sr. (Car 3), was appointed as Acting 1st Deputy Commissioner (Car 2), which was Chief Hudgins's position.

88.    On September 17, 2025, Fire Commissioner Thompson sent out another General Memorandum to Officers and Members of the PFD, stating that the PFD had a vacancy of 1st Deputy Commissioner, which was Chief Hudgins's position.

89.    At the time both memorandums were released, the City did not notify Chief Hudgins that he was no longer in the role of 1st Deputy Commissioner. Chief Hudgins was still on forced leave and did not have access to the released memorandum. Chief Hudgins believed he was returning to work in his role of 1st Deputy Commissioner, as stated by Fire Commissioner Thompson on their earlier phone call around July 2025.

**On October 9, 2025, the City demotes Mr. Hudgins and cuts his salary by about $75,000 for allegedly violating the sexual harassment policy**

90.    In or around early October, the City, PFD, Mayor Cherelle Parker, Tiffany Thurman, and Fire Commissioner Thompson bypassed standard HR protocols to quickly demote Mr. Hudgins. Upon information and belief, the City and Mayor Cherelle Parker's legal team drafted the demotion letter and gave the draft to Fire Commissioner Thompson. Fire Commissioner Thompson gave the demotion letter to HR Director Ray to send to Chief Hudgins.

91.    HR Director Ray spoke to Fire Commissioner Thompson, questioning the basis for Mr. Hudgins's demotion. In response, Fire Commissioner Thompson ordered her to just do what was being told, to copy/paste the provided text into a letter, and to send the letter to Mr. Hudgins.

92.    On or about October 9, 2025, HR Director Ray called Mr. Hudgins on the phone and told him that "a demotion was coming". She explained that the demotion was backdated to the end of September 2025, and asked him to designate leave time from September until October. Mr. Hudgins declined to use his leave, stating that he had not been notified of any change in status until now.

93.    On the same call, HR Director Ray told Mr. Hudgins that the demotion was due to a violation of the sexual harassment policy. Mr. Hudgins asked her which part of the sexual harassment policy he specifically violated, such as a section or page. In response, Director Ray admitted she did not have that information and responded something like "I don't know, this is all they gave me, it came straight from Fire Commissioner Thompson. I was told to give it to you."

94.    On the same call, Mr. Hudgins told HR Director Ray that he was being retaliated against by the women and now the City and PFD, for uncovering the overtime fraud. HR Director Ray agreed on the call that he was being retaliated against and said that she was not involved in the law firm's investigation so she could not do anything about it.

95.    After the call, HR Director Ray did not follow up with or look into Mr. Hudgins's legitimate complaints of retaliation.

96.    Shortly after the call, on or about October 9, 2025, Mr. Hudgins received the official demotion letter, via email and certified mail. The letter was dated October 9, 2025 and stated:

> Dear Anthony Hudgins:
>
> Due to the serious nature of the multiple complaints that were filed against you, an investigation was conducted.  The investigation concluded with a determination being made by the Employee Relations Unit (ERU) of the Department of Labor that a violation of the City of Philadelphia Sexual Harassment Prevention Policy did occur.
>
> As a result, your exempt status has been revoked, and you are being demoted to your civil service rank of Fire Deputy Chief with the City of Philadelphia Fire Department.  The effective date of this appointment is 9/29/2025. Your salary will be Pay Range 309, Step 4= $155,106.50.
>
> You are being reassigned as indicated below:
>
> WORK REPORTING INSTRUCTIONS

Date:   Immediately
Location: Incident Safety Office, Park Ave & Cambria Street
Platoon: "D"

97.    The City, PFD, Mayor Cherelle Parker, Ms. Thurman, Fire Commissioner Thompson, and Chief Human Resources Candi Jones placed Mr. Hudgins in an isolated, non-supervisory office in North Philadelphia with no direct reports, and cut his salary by $ 74,893.50 per year, backdated his demotion by 10 calendar days from when he was notified.[6]

98.    The City, PFD, Mayor Cherelle Parker, Ms. Thurman, and Fire Commissioner Thompson and Chief Human Resources Candi Jones demoted Mr. Hudgins with knowledge that the allegations against him lacked credibility.

99.    The City, PFD, Mayor Cherelle Parker, Ms. Thurman, and Fire Commissioner Thompson and Chief Human Resources Candi Jones did not follow the recommendation in the internal sexual harassment investigation report.

100.  The City and PFD did not provide Mr. Hudgins the findings of the sexual harassment investigation against him, other than stating that he violated the policy.

101.  The City and PFD did not tell Mr. Hudgins his "hugging" was improper. They did not give Mr. Hudgins any warnings or verbal reprimands regarding his "hugging". They did not provide Mr. Hudgins any training or counseling regarding proper versus improper "hugging".

102.  A near $75,000 demotion, with no prior warnings or discipline, is not proportional to an alleged violation of "hugging", that was "found offensive or unwelcome" by two women who defrauded the City and obstructed the overtime investigation.

103.  The City and PFD's disciplinary process was done in bad faith, against the weight of the City's own internal evidence.

---

[6] Mr. Hudgins's role as 1st Deputy Commissioner was located at the PFD's Headquarters at 240 Spring Garden St, Philadelphia, PA 19123

104.  The alleged policy violation served as pretext to justify the City and PFD's retaliatory decision. The actual reason they demoted Mr. Hudgins was because he was a whistleblower.

105.  The City, PFD, and its leadership did not protect him from the malicious, harassing, and retaliatory acts of Defendants Murphy, Farris, Quinones, Boyle, and Jackson.

**On December 10, 2025, the Philadelphia Inquirer publishes an article about Mr. Hudgins's demotion, with the City confirming his demotion, yet staying silent on Defendant Murphy's fraudulent activities and her termination**

106.  On December 10, 2025, the Philadelphia Inquirer published an article titled, "A top-ranking fire department official was demoted amid a sexual harassment probe. The city refuses to discuss the case."[7]

107.  In the article, a spokesperson for the City and the PFD confirmed Mr. Hudgins's demotion in response to the Inquirer's inquiry about the results of the sexual harassment investigation against Mr. Hudgins, but refused to disclose that Defendant Murphy had been terminated for her fraudulent activities.

108.  The City and PFD afforded Defendant Murphy, a female, confidentiality regarding her employment status while publicly revealing Mr. Hudgins employment status, a male.

109.  The City and PFD curated a one-sided, prejudicial narrative that shielded a female wrongdoer Murphy and exposed a male whistleblower Mr. Hudgins to public scorn.

110.  City Solicitor Renee Garcia, speaking for Mayor Cherelle Parker, claimed the City takes fraud and harassment "very seriously," yet the City did not investigation Murphy and Farris' harassing and retaliatory conduct against Mr. Hudgins.

111.  Defendants' actions have resulted in the false branding of Mr. Hudgins as a sexual harasser among his peers, the firefighting community, and the public at large. This

---

[7] See https://www.inquirer.com/news/philadelphia/fire-department-sexual-harassment-anthony-hudgins-20251210.html

characterization has caused Mr. Hudgins profound embarrassment and humiliation, leading to severe emotional distress, professional isolation, and demotion. The damage to his reputation has effectively foreclosed any future opportunities for leadership within the fire service.

## COUNT I

### RETALIATION IN VIOLATION OF PUBLIC POLICY OF PENNSYLVANIA WHISTLEBLOWER LAW

**(Against Defendants City of Philadelphia,
Philadelphia Fire Department, Mayor Cherelle Parker, Tiffany Thurman,
and Fire Commissioner Jeffrey Thompson)**

112.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

113.  Plaintiff timely brings this "Civil Action" within "180 days" after the occurrence of his retaliatory demotion pursuant to 43 P.S. § 1424.

114.  Plaintiff made several "good faith reports[s] of "wrongdoing or waste" as defined under the Pennsylvania Whistleblower Act ("PWA") to his "employer" or a "public body". See 43 P.S. § 1442. These reports included, but were not limited to: reporting substantial overtime fraud involving Murphy and Farris to Defendants.

115.  Defendants retaliated against Plaintiff via demotion for making "good faith reports" to his employer of "wrongdoing or waste" under the PWA in violation of 43 P.S. §1423.

116.  A direct causal connection exists between Plaintiff's protected reports and the adverse employment action.

117.  Defendants used a pretextual reason to demote him for being a whistleblower.

118.  As a direct and proximate result of the Defendants' retaliation, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

**COUNT II**

**PROCEDURAL DUE PROCESS VIOLATION UNDER THE
STIGMA PLUS DOCTRINE – 14th AMENDMENT
(BY AND THROUGH 42 U.S.C. § 1983)**

**(Against Defendants City of Philadelphia,
Philadelphia Fire Department, Mayor Cherelle Parker, Tiffany Thurman,
and Fire Commissioner Jeffrey Thompson)**

119.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

120.  Under the "stigma plus" test, the creation and dissemination of a false and defamatory impression is "stigma" element. Hill v. Borough of Kutztown, 455 F.3d 225, 236-38 (3d Cir.2006). A demotion, meaning a change in duties with a pay reduction can be the "plus" element. Id. When such a deprivation occurs, the employee is entitled to a name-clearing hearing. To satisfy the stigma prong of the test, the employee must show: 1) publication of 2) a substantially and materially false statement that 3) infringed upon the reputation, honor, or integrity of the employee. Id.

121.  Defendants demoted Plaintiff.

122.  Murphy and Farris made false statements while at work and to the *Philadelphia Inquirer* that Hudgins sexually harassed them. Defendants effectively adopted, ratified, and publicized such statements through their actions of prioritizing the women's bad-faith complaints while refusing to investigate Plaintiff's complaints.

123.  Defendants created a stigmatizing public record against Mr. Hudgins by concluding and disseminating to others that he violated the City's Sexual Harassment Prevention Policy, which is a substantially and materially false statement.

124.  Defendants publicly confirmed to the *Philadelphia Inquirer* in December 2025 that Chief Hudgins was demoted due to the sexual harassment investigation, which is a substantially and materially false statement.

125.  Defendants' statements infringed upon Plaintiff's reputation, honor, and integrity.

126.  Defendants failed to provide Plaintiff with a meaningful name-clearing hearing or any opportunity to challenge the stigmatizing label before or after his demotion was applied.

127.  Defendants back-dated Plaintiff's demotion by 10 days prior to notice.

128.  Defendants' conduct has foreclosed or otherwise inhibited Plaintiffs' freedom to take advantage of other leadership opportunities in the fire service profession.

129.  As a direct and proximate result of the Defendants' due process violation, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT III

**SEX DISCRIMINATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**

**(Against City of Philadelphia and Philadelphia Fire Department)**

130.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

131.  Plaintiff is a member of protected classes in that he is a male.

132.  Plaintiff is qualified for his position.

133.  Similarly situated persons outside of Plaintiff's protected classes were treated more favorably than Plaintiff.

134.  Defendants treated women more favorably than men.

135.  Circumstances exist related to the above-cited employment actions that give rise to an inference of discrimination.

136.  No legitimate, non-discriminatory reasons exist for the above cited adverse employment actions that Plaintiff suffered.

137.  The reasons cited by Defendants for the adverse employment actions that Plaintiff suffered are pretext for discrimination.

138.  Defendants demoted Plaintiff.

139.  As a result of Defendants' unlawful gender discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT IV

### HOSTILE WORK ENVIRONMENT IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

### (Against City of Philadelphia and Philadelphia Fire Department)

140.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

141.  Taken together, the acts above constitute a hostile work environment based on sex.

   a.  Plaintiff suffered intentional discrimination because of his membership in a protected class – male.

   b.  Such discrimination was severe or pervasive.

   c.  Such discrimination detrimentally affected Plaintiff.

   d.  Such discrimination would have detrimentally affected a reasonable male in Plaintiff's position.

142.  The unlawful employment practices outlined above were intentional or were of a nature so as to make subjection to the hostile environment a condition of employment.

143.  Plaintiff suffered tangible adverse employment actions as alleged herein.

144.  Defendants knew or reasonably should have known of the women's harassment towards Plaintiff.

145.  Defendants failed to exercise reasonable care to prevent and promptly correct the harassing behavior.

146.  As a result of Defendants' conduct as aforementioned, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## <u>COUNT V</u>

**RETALIATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED**

**(Against City of Philadelphia and Philadelphia Fire Department)**

147.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

148.  Plaintiff engaged in protected activity when Plaintiff complained to Defendant when he reported what he reasonably believed to be a hostile work environment and discriminatory retaliation based on his sex.

149.  Defendants City and PFD had actual and constructive knowledge of Plaintiff's protected activity through reports made to Fire Commissioner Thompson, the City's appointed investigators, and the PFD's Human Resources.

150.  Thereafter, Defendants took adverse employment actions against Plaintiff, including, but not limited to demotion.

151.  There exists a causal connection between Plaintiff's participation in the protected

activity and the adverse employment action.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this

Complaint, *infra*.

## COUNT VI

### SEX DISCRIMINATION IN VIOLATION  OF THE 14th AMENDEMENT (BY AND THROUGH 42 U.S.C. § 1983)

**(Against Defendants City of Philadelphia, Philadelphia Fire Department, Mayor Cherelle Parker, Tiffany Thurman, and Fire Commissioner Jeffrey Thompson)**

152.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

153.  An employee is protected from discrimination under the 14th Amendment of the United

States Constitution relating to Equal Protection.

154.  Plaintiff re-alleges and re-asserts all prior allegations as set forth previously in the

Complaint as Defendants' actions also constitute unlawful discrimination under the 14th

Amendment, pursued herein under § 1983.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this

Complaint, *infra*.

## COUNT VII

### HOSTILE WORK ENVIRONMENT IN VIOLATION  OF THE 14th AMENDEMENT (BY AND THROUGH 42 U.S.C. § 1983)

**(Against Defendants City of Philadelphia, Philadelphia Fire Department, Mayor Cherelle Parker, Tiffany Thurman, and Fire Commissioner Jeffrey Thompson)**

155.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

156.  An employee is protected from a hostile work environment under the 14th Amendment of the United States Constitution relating to Equal Protection.

157.  Plaintiff re-alleges and re-asserts all prior allegations as set forth previously in the Complaint as Defendants' actions also constitute unlawful hostile work environment under the 14th Amendment, pursued herein under § 1983.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT VIII

### RETALIATION IN VIOLATION  OF THE 14th AMENDEMENT (BY AND THROUGH 42 U.S.C. § 1983)

**(Against Defendants City of Philadelphia,
Philadelphia Fire Department, Mayor Cherelle Parker, Tiffany Thurman,
and Fire Commissioner Jeffrey Thompson)**

158.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

159.  An employee is protected from retaliation under the 14th Amendment of the United States Constitution for expressing concerns of Equal Protection.

160.  Plaintiff re-alleges and re-asserts all prior allegations as set forth previously in the Complaint as Defendants' actions also constitute unlawful retaliation under the 14th Amendment, pursued herein under § 1983.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT IX

### DEFAMATION - PRIVATE INDIVIDUAL

**(Against Jacqulyn Murphy, Marian Farris,
Michael Bresnan, and IAFF Local 22 *via vicarious liability*)**

161.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

162.  Defendants published false statements to the Philadelphia Inquirer on May 6, 2025. The statements made by Defendants falsely accused Plaintiff of sexual harassment and professional misconduct.

163.  Defendant Bresnan was acting both in his individual capacity and on behalf of Defendant IAFF Local 22 when he made statements to the Inquirer about Plaintiff.

164.  Defendant IAFF Local 22 is vicariously liable for the defamatory statements made by Defendant Bresnan in his capacity as Union President.

165.  The statements specifically named and identified Mr. Hudgins.

166.  Defendants' statements were made with actual knowledge or a reckless disregard for the truth.

167.  Average readers of the Philadelphia Inquirer and PFD employees understood the statements to mean Plaintiff was a sexual predator, a serial sexual harasser, or unfit for leadership.

168.  Defendant Murphy and Farris abused any perceived privilege by submitting sexual harassment claims in bad faith, with actual malice, and with knowledge such claims were false.

169.  The statements falsely impute criminal behavior and professional unfitness to Plaintiff, and thereby constitute defamation per se, and damages are presumed as a matter of law.

170.  As a direct and proximate result of the Defendants' false statements, Plaintiff has suffered damages herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT X

### DEFAMATION - PUBLIC FIGURE (in the alternative)

**(Against Jacqulyn Murphy, Marian Farris,
Michael Bresnan, and IAFF Local 22 *via vicarious liability*)**

171.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

172.  To the extent the Court finds Plaintiff to be a public official or public figure, he brings this claim in the alternative.

173.  Defendants acted with actual malice when making the false statements.

174.  Plaintiff re-alleges and re-asserts all prior allegations as set forth previously in the Complaint as Defendants' actions also constitute defamation of a public figure or official.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT XI

### FALSE LIGHT INVASION OF PRIVACY - PRIVATE FIGURE

**(Against Jacqulyn Murphy, Marian Farris,
Michael Bresnan, and IAFF Local 22 *via vicarious liability*)**

175.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

176.  False light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression. Rubin v. CBS Broad. Inc., 170 A.3d 560 (Pa. Super. 2017).

177.  Defendants published highly sensitive and false accusations to the Philadelphia Inquirer on May 6, 2025, which reached a broad audience of the general public and City employees.

178.  Defendants selectively publicized information in a manner creating a false impression.

179.  Defendants' publications falsely portrayed Plaintiff as a sexual predator, a criminal, and a supervisor who abused his power to harass subordinates.

180.  A reasonable person would find being publicly labeled as a serial sexual harasser who engaged in professional misconduct to be highly offensive to their reputation.

181.  Defendants acted with knowledge or with reckless disregard for the false impression of these claims and the false light that Plaintiff would be placed under.

182.  Defendant Murphy and Farris abused any perceived privilege by submitting sexual harassment claims in bad faith, with actual malice, and with the knowledge that such claims were false.

183.  Defendant IAFF Local 22 is vicariously liable for the actions and statements of Defendant Bresnan, who acted on behalf of the Union when publicizing these statements.

184.  As a direct and proximate result of the Defendants' highly offensive statements false light, Plaintiff has suffered damages herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## <u>COUNT XII</u>

**FALSE LIGHT INVASION OF PRIVACY– PUBLIC FIGURE (in the alternative)**

**(Against Jacqulyn Murphy, Marian Farris,
Michael Bresnan, and IAFF Local 22 *via vicarious liability*)**

185.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

186.  To the extent the Court finds Plaintiff to be a public official or public figure, he brings this claim in the alternative.

187.  Defendants acted with actual malice with making the false statements.

188.  Plaintiff re-alleges and re-asserts all prior allegations as set forth previously in the Complaint as Defendants' actions also constitute false light of a public figure or official.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT XIII

### TORTIOUS INTERFERENCE

**(Against Jacquelyn Murphy, Marian Farris, Tabitha Boyle,
Christina Quinones, and Dana Jackson)**

189.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

190.  Plaintiff maintained a valid contractual relationship with his employers, the City of Philadelphia and the Philadelphia Fire Department, serving as 1st Deputy Commissioner.

191.  Defendants Murphy, Farris, Quinones, Boyle and Jackson acted in concert to purposefully interfere with the aforementioned relationship, with intent to harm Plaintiff.

192.  Defendants' actions were not privileged and lacked any legal justification.

193.  Defendants abused any perceived privilege by submitting sexual harassment claims in bad faith, with actual malice, and with the knowledge that such claims were false.

194.  As a direct and proximate result of Defendants actions, Plaintiff was demoted and has suffered damages herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## COUNT XIV

### CIVIL CONSPIRACY

**(Against Jacquelyn Murphy, Marian Farris, Tabitha Boyle,
Christina Quinones, Dana Jackson)**

33

195.  Plaintiff incorporates preceding paragraphs as if set forth more fully at length herein.

196.  Defendants combined or agreed intending to commit an unlawful act or to do a lawful act by unlawful means or unlawful purpose, including tortiously interfering with Plaintiff's employment, obstructing an internal investigation into overtime fraud, and retaliating against Plaintiff for uncovering the fraud.

197.  Defendants Boyle, Quinones, and Jackson were aware of and complicit in Defendants Murphy and Farris' fraudulent overtime activities.

198.  Defendants committed several overt acts to achieve their common goal, including filing false claims made in bad faith that Plaintiff was a sexual harasser; recruiting other employees to join the bad-faith complaint against Plaintiff; cold-calling employees to join in on the complaint; and publishing false statements in the Philadelphia Inquirer.

199.  As a direct and proximate result of Defendants' actions, Plaintiff was demoted and has suffered damages herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the Prayer for Relief clause of this Complaint, *infra*.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Anthony Hudgins, requests that the Court grant him the following relief against all Defendants:

a) Compensatory damages, including payment for lost wages and benefits, both to date and prospectively into the future;

b) Damages for emotional pain and suffering, humiliation, professional embarrassment, mental anguish, loss of enjoyment of life, and injury to Plaintiff's professional reputation;

c) Liquidated damages as provided for under the Pennsylvania Whistleblower Law, 43 P.S. § 1425, and other applicable statutes;

d) Punitive damages against individual defendants Parker, Thurman, Thompson, Bresnan, Murphy, Farris, Boyle, Quinones, and Jackson where permitted by statute or law for their malicious, willful, or reckless disregard of Plaintiff's federal and state protected rights;

e) Punitive damages against Defendants the City, PFD, and IAFF Local 22 where permitted by statute or law for their malicious, willful, or reckless disregard of Plaintiff's federal and state protected rights;

f) Order directing Defendants the City and PFD to immediately reinstate Plaintiff to his position as 1st Deputy Commissioner (Car 2) with full seniority and status restored;

g) Order requiring Defendants the City and PFD's permanent removal and expungement of all negative, discriminatory, and defamatory documents from Plaintiff's personnel files, including all records related to Plaintiff's demotion;

h) Reasonable attorneys' fees;

i) Recoverable costs;

j) Pre- and post- judgment interest;

k) Nominal damages;

l) An allowance to compensate for any negative tax consequences from a lump sum award;

m) Awarding such other relief as appears reasonable and just under the circumstances.

n) Such other and further relief as the Court determines to be just and proper.

## JURY TRIAL DEMAND

Demand is hereby made for a trial by jury as to all issues.

Respectfully submitted,

Date: January 7, 2026

**MY WORK ATTORNEY, LLC**
By: */s/ Amanda N. Martinez*
Amanda N. Martinez, Esq. (338141)
1315 Walnut St Ste 801
Philadelphia, PA 19107
215-445-1482
amanda@myworkattorney.com
*Attorney for Plaintiff Anthony Hudgins*