# EXHIBIT 1

| | | |
|---|---|---|
| **Subject:**<br>Jacqulyn Murphy (269758)<br>Fire Service Paramedic<br>Philadelphia Fire Department | **Type of Investigation:**<br>Employee Misconduct<br>Criminal Fraud | **Type of Report:**<br>☐ Final<br>☒ Ongoing |
| **File Number:**<br>**25-0007-I** | ☒ **Employee** ☐ **Contractor** | |
| **Period of Investigation:**<br>January 2025 - Present | **Department/Program:**<br>Philadelphia Fire Department | |

# CITY OF PHILADELPHIA
# OFFICE OF THE INSPECTOR GENERAL

## Report of Investigation
## *PFD Overtime*

| Distribution | No. | |
|---|---|---|
| **Philadelphia Fire Department** | 2 | **Signature of Investigator Making Report:** |
| **Mayor's Office** | 2 | **Signature of Inspector General:** |
| **Managing Director's Office** | 2 | |
| **Law Department** | 1 | **Date of Report:**<br>September 9, 2025 |

**OFFICIAL USE ONLY**

THIS DOCUMENT IS PROVIDED FOR OFFICIAL USE ONLY. ANY REQUEST FOR DISCLOSURE OR FURTHER DISSEMINATION OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO THE OFFICE OF THE INSPECTOR GENERAL.

## I. Executive Summary

In the fall of 2024, First Deputy Fire Commissioner Anthony Hudgins (Hudgins) identified significant discrepancies in the overtime records of Fire Service Paramedic (FSP) Jacqulyn Murphy (Murphy). In January 2025, the matter was referred to the Office of Inspector General (OIG) for additional investigation.

The OIG conducted a full review of FSP Murphy's timekeeping and take-home compensation during calendar years 2023 and 2024 – comparing Murphy's paid overtime with all available approval records, attendance records, payroll records and human resources transaction histories in the OnePhilly system. OIG investigators also interviewed key Fire Department personnel and reviewed all of Murphy's City email activity and social media activity. This review yielded the following factual conclusions:

*i.* FSP Murphy received excessive overtime compensation in 2023 and 2024, much of which appears questionable as a matter of schedule alone;

*ii.* The vast majority of Murphy's paid overtime was never approved by any supervisor or ranking member of the Fire Department;

*iii.* FSP Murphy's attendance records show 100 absences that were never recorded on her official timesheets;

*iv.* FSP Murphy's take-home pay was grossly inflated due to improper federal income tax withholding;

*v.* Former Payroll Supervisor Marian Farris[1] (Farris) aided, executed and benefitted from this illicit activity.

Taken together, there is sufficient, probative and substantial evidence to conclude that former payroll employee Farris and FSP Murphy made a number of joint misrepresentations that ultimately defrauded the City of Philadelphia of unearned and unjust compensation. The OIG therefore recommends:

*i.* Immediate dismissal of FSP Murphy and withholding of terminal pay, following all departmental and collective bargaining procedures;

*ii.* Reorganization of the Fire Department's civilian payroll personnel;

*iii.* Strengthened City-wide and department-level overtime and timekeeping controls.

Part II of this report presents the Fire Department's initial audit findings and the OIG's process of investigation. Parts III and IV offer foundational background information about the Fire Department's timekeeping practices and FSP Murphy's employment history. Part V presents the primary investigative findings, outlined above, and Part VI concludes with the OIG's analysis and recommendations.[2]

---

[1] Marian Farris resigned from City employment in March 2025, during the course of this investigation.
[2] The OIG investigation remains ongoing.

## II. Fire Department Audit & OIG Investigation

In January 2025, the Fire Department's Chief of Staff referred this matter to the OIG for investigation, following an initial departmental review that identified significant discrepancies in the overtime accruals for Paramedic Jacqulyn Murphy.[3] Specifically, First Deputy Commissioner Hudgins and his staff conducted an internal audit of available overtime approval records for Murphy as well as several other members of the service.

The results of the Fire Department audit showed that Murphy recorded overtime on more than 200 occasions in 2024, but more than 80% of these claimed assignments lacked any record of documented approval from Murphy's chain-of-command.[4] The Fire Department subsequently requested OIG assistance.[5]

To assess the full scope of Murphy's activity, the OIG collected the following evidence:

*Documents & Records*

- PFD Overtime Approval Sheets
- PFD Roll Calls & Attendance Records
- OnePhilly Transaction & Payment Histories
- Social Media (Facebook, Instagram, X, etc.)
- City of Philadelphia Emails 2023-2024

*Investigative Interviews – PFD Personnel*

- First Deputy Anthony Hudgins
- Assistant Director of Finance Shipra Jha
- Deputy Director of Finance Valerie Hayes
- FSP Corrina Cosenza
- Administrator Garret Dietz
- Chief Raymond Farley
- Captain Raymond McCahery
- Chief Robert Brennan
- Lieutenant Christine Severio
- Deputy Chief Anthony Bompadre
- Payroll Supervisor Nuriyah Jordan
- Payroll Supervisor Matthew Pepe
- HR Director Princess Cencerae N. Ray
- Captain Bethann Jablonski
- Deputy Commissioner Martin McCall
- EMS Training Chief Keith Davis

---

[3] First Deputy Hudgins stated that he began to closely examine department-wide overtime upon promotion in the summer of 2024. In October 2024, he reported receiving a text message from a colleague who pointed out that FSP Murphy received nearly $300,000 in yearly compensation, according to open data. This prompted his deeper review of Murphy's overtime records, specifically.

[4] A summary of the Fire Department's initial findings has been included with this report as ***Appendix A***. The PFD analysis addressed Murphy's overtime, as well as that of eight (8) additional personnel who worked with Murphy. As shown in ***Appendix A***, the results showed that Murphy was a significant outlier among similarly situated employees.

[5] In November 2024, shortly after Hudgins began his overtime review, IAFF Local 22 Union filed a complaint of employment discrimination, naming Hudgins as the respondent and Murphy as one of the alleged victims. The EEO investigation was completed in July 2025 and is not substantively addressed here. The OIG offers no conclusion about the merits of that complaint except to note that Hudgins' overtime review apparently preceded any complaint of discrimination.

Building on the Fire Department's initial review, the OIG investigation fully compared Murphy's instances of paid overtime with the corresponding approval and attendance records for the entire calendar years 2023 and 2024. OIG investigators then reviewed Murphy's City email activity and social media posts to supplement the analysis and determine whether Murphy was, in fact, compensated for overtime that was never authorized and/or never actually performed.

Select evidence has been presented in the *Appendix* of this report, in an effort to give the reader a clear sense of the technical material referenced throughout. In addition to the *Appendix*, the OIG has assembled three (3) supplemental volumes that contain the full catalog of evidence – all overtime sheets, roll calls and OnePhilly records from calendar years 2023 and 2024, as well as some key email selections that speak to Murphy's physical whereabouts at various points in time. The underlying evidence for cited *Examples* in this report can be found in the supplemental volumes.

It is important to note that the OIG has not yet conducted interviews of the subject employees. Because the evidence presented here strongly suggests criminal activity, statements of current employees have been deferred to protect any subsequent criminal investigation.[6] Because Marian Farris resigned from employment in March 2025,[7] the OIG made several attempts to interview her, including after she retained legal counsel. Farris did not appear for any of her scheduled appointments and did not cooperate with this investigation.

## III. Background – Departmental Timekeeping & Overtime

Like most City departments, the technical administration of employee compensation is the responsibility of civilian employees in the Fire Department's Payroll Unit. Supervised by PFD HR Manager Princess Cencerae N. Rae, the Payroll Unit is comprised of civilian staff who are responsible for timekeeping and compensation accuracy for both uniformed and civilian members of the Fire Department.

Each of the uniformed PFD units is independently responsible for employee schedules and timekeeping, using internal roll call logs to properly document which employees were present and which were absent on any given day. These roll calls will typically note hours worked, scheduled time off and/or any use of paid or unpaid leave.[8] Unit supervisors then upload these attendance documents to the shared PFD SharePoint system so that they can be accessed by the civilian employees in the Payroll Unit, who then retrieve that information and transpose it into the City-wide payroll system. In this way, the department seeks full consistency between the unit-level attendance records and the official timekeeping record for the purpose of generating compensation and adjusting leave balances.

The PFD overtime process mirrors this structure. When a member of the service performs any overtime, departmental procedure requires a corresponding document to record official approval. When a unit supervisor or executive requires additional staff, he or she will prepare an Overtime Approval Form to document the reasons why the overtime was necessary.[9] This form is also uploaded to the internal SharePoint site and then must be electronically signed by an additional two supervisors – thus, any overtime must include official approval from three levels of command before it can be finally approved.

---

[6] *See, e.g.*, *Garrity v. New Jersey*, 385 U.S. 493 (1967); *NLRB v. Weingarten, Inc.*, 420 U.S. 251 (1975).
[7] Marian Farris' resignation letter can be found in ***Appendix B***.
[8] For illustration purposes, an example PFD weekly roll call has been included as ***Appendix C***.
[9] For illustration purposes, an example PFD Overtime Approval Form has been included as ***Appendix D***.

Just as with the roll call documents, the Overtime Approval Forms are then retrieved by the Payroll Unit employees who check the approvals and make the corresponding pay adjustments in the City payroll system. Again, the Fire Department seeks 100% consistency between the approval documents and the actual pay record – according to all parties interviewed, there should *never* be an instance when a member of the department received overtime pay that was not properly documented and approved via an official Overtime Approval Form housed in the SharePoint database.

## IV. Background – FSP Jacqulyn Murphy

First hired as a Paramedic in 2009, Murphy has been assigned to the Fire Department's Continuous Quality Improvement (CQI) Unit since 2019. Supervised by Chief Raymond Farley (Farley), head of EMS Administration, the CQI Unit is generally tasked with auditing patient care reports and reviewing civilian complaint activity for quality control purposes. The CQI function is purely administrative and physically located at the Fire Administration Building (FAB) at 3rd Street and Spring Garden. Notably, the CQI uniformed employees, including FSP Murphy, sit adjacent to the PFD's civilian Payroll Unit within the FAB.

Chief Farley and all others interviewed confirmed that the CQI Unit does not have any regular need for overtime. Because the CQI group is not engaged in emergency response, special events or other time sensitive field operations, the employees there have a very consistent 8:00AM to 4:30PM M-F regular shift. Any overtime that CQI employees accrue, therefore, must come from another departmental unit or need. Consistent with PFD practice and policy, overtime opportunities are generally advertised on department-wide bulletins and employees within the CQI can pick-up those additional assignments when available[10] – but this work is voluntary and entirely external to the CQI.

According to the City's official OnePhilly records, since her initial assignment to the CQI group in 2019, FSP Murphy has been compensated for significant overtime as shown in Table 1 below:

**Table 1: FSP Murphy's Compensation by Year (OnePhilly)**

| Year | Base Salary | Overtime Compensation | OT Hours Recorded[11] |
|---|---|---|---|
| 2019 | $83,806 | $36,989.03 | 622 |
| 2020 | $85,901 | $66,079.00 | 1080.71 |
| 2021 | $88,263 | $65,170.49 | 1045.5 |
| 2022 | $91,352 | $63,959.47 | 988 |
| 2023 | $94,549 | $121,700.41 | 1812 |
| 2024 | $99,276 | $158,139.34 | 2279 |
| 2025[12] | $99,276 | $42,434.99 | 595 |

Note that during the first few years of FSP Murphy's tenure in CQI, she accrued roughly around 600 to 1000 total hours of overtime per year with relative consistency. In 2023 and 2024, however, FSP Murphy's overtime dramatically spiked – effectively doubling from prior years.

Also notable in the data above is the relative decline in the rate of total compensation for calendar year 2025 thus far. This decline in activity appears to closely coincide with the initiation of the OIG investigation.

---

[10] There is some inconsistency in the manner that overtime opportunities are advertised and made available to potential volunteers across the department. This issue is not directly relevant to this investigation, and the Fire Commissioner has recognized a need to more fairly and openly advertise overtime opportunities.
[11] With the exception of "callbacks" – or non-voluntary overtime – which sets a minimum of four (4) hours, all other hours should reflect actual worktime.
[12] Through May 2025.

Before even addressing the extent to which this overtime was authorized, it is important to emphasize the obvious physical difficulty that such extensive overtime work would require. Murphy's official time records are riddled with pay for long overtime shifts that were allegedly performed back-to-back, raising serious questions about whether this activity is even possible or prudent. Specific examples include:

*Example 1: Saturday, April 22, 2023*[13]
On this date, Murphy was paid for two different overtime shifts: one from 7:00AM to 5:00PM and another from 9:00AM to 5:00PM., totaling 18 hours of overtime. Of course, the recorded work times for these shifts clearly overlap – there is no possible way to work both of these shifts as reported.

*Example 2: Friday, April 28, 2023 – Monday, May 1, 2023*
Murphy's official timecards show a vacation day used on that Friday, April 28, but she was also paid for 12 hours of overtime accrued during a 5:45PM to 4:15AM shift, ending Saturday morning. That same Saturday, April 29, Murphy was paid for two (2) additional overtime shifts from 6:00AM to 4:00PM, then again from 5:45PM to 4:15AM. That Sunday, April 30, Murphy was again paid for an overtime shift recorded as 5:00AM to 4:00PM. Thus, according to official time records, Murphy worked about 44 hours of continuous overtime from Friday evening straight through to Sunday afternoon, before resuming her regular work shift on Monday.

*Example 3: Friday May 17, 2024 – Monday, May 20, 2024*
Murphy's official timecards show a regular 8 hour shift on Friday, in addition to a claimed 16 hours of overtime on that same Friday, May 17. On Saturday, May 18, she was paid for another 12 hours of overtime, reportedly ending at 4:15AM on Sunday, before accruing an additional 23 hours of overtime the same Sunday. Murphy reported 51 hours of overtime in the course of three days. Her timesheet for Monday documented a regular 8:00AM shift.[14]

Without any deeper analysis, and without reference to any approval documents or roll calls, these timecards should have raised a red flag due to the excessive work hours claimed. Murphy's overall compensation and claimed schedule should have prompted an internal review much earlier.

## V. Primary Investigative Findings

Given the basic overtime data above, the OIG investigation centered on a full review of FSP Murphy's paid overtime in calendar years 2023 and 2024. For each instance of accrued overtime, OIG investigators reviewed available Overtime Approval Forms, roll call attendance records, OnePhilly records, email activity and other evidence to determine whether her total compensation was, in fact, warranted.

This analysis yielded four (4) key findings: *(i)* the vast majority of FSP Murphy's overtime during this period lacks any record of appropriate departmental approval; *(ii)* attendance records during this period show that FSP Murphy was often compensated for both regular and overtime hours on days that she was demonstrably absent, travelling or otherwise out-of-office; *(iii)* FSP Murphy's OnePhilly federal income tax withholding status was frequently and inexplicably adjusted to include significant periods of *zero*

---

[13] All underlying data for presented examples is available in the supplemental volumes to this report.
[14] For Examples 2 and 3, Murphy was compensated for "regular hours" on the subsequent Mondays. The CQI roll call documents for these Mondays, however, record Murphy as absent from work – a key timekeeping misrepresentation that is more fully explained in later sections.

withholdings; and *(iv)* there is substantial evidence to suggest that FSP Murphy's illicit activity was with direct and unjustifiable assistance from former PFD Payroll Supervisor Marian Farris.

For each finding, the following subsections present the underlying evidence and some examples of specific dates that directly illustrate these investigative conclusions.

*i.* ***In 2023 and 2024, roughly 66% of FSP Murphy's claimed overtime assignments were not authorized.***

As presented above, Fire Department leadership has been very clear that for each specific instance[15] of overtime there must be a corresponding form to document approval from FSP Murphy's chain-of-command, regardless of where that overtime assignment may have been initiated. A full search of the department's internal SharePoint site yielded the following results:

**Table 2: Approval Records for FSP Murphy's Overtime**

| Year | Overtime Compensation | Overtime Assignments Claimed | Assignments with Approval | Assignments without Approval | Failure Rate |
|---|---|---|---|---|---|
| 2023 | $121,700.41 | 200 | 86 | 114 | 57% |
| 2024 | $158,139.34 | 321 | 93 | 228 | 71% |
| **Total** | **$279,839.75** | **521** | **179** | **342** | **66%** |

At scale, these results are statistically very significant and strongly suggest that Murphy received unearned compensation. To anchor these figures, review of overtime approval records for an additional eight (8) similarly situated employees yielded only three (3) failures across the entire group.[16] FSP Murphy's record shows an astounding 342 failures. Breaking this data down further, the graphs below present FSP Murphy's overtime approvals by calendar month.

Graph 1: FSP Murphy OT Approvals by Month (2023)




[15] For purposes of this report, an "instance" of overtime refers to a single overtime assignment that could vary in length.
[16] *See Appendix A.*

Graph 2: FSP Murphy's OT Approvals by Month (2024)




Note the gradual increase in unapproved overtime through 2023, peaking in 2024 and then fully stopping in November and December of that year – there are no failures in these final months of 2024. Once again, this directly coincides with the Fire Department's internal discovery of the deficiencies in Murphy's pay record. The month-by-month results also track another pattern shown in Murphy's City email history – starting in June 2023, her emails include regular sports betting receipts from sites like BetMGM. Emails document a fairly heavy gambling habit through 2023 and for the bulk of 2024.

Understanding that the failure rate from this analysis is not directly proportional to the amount of unauthorized overtime compensation,[17] it is important to present a sense of the financial impact of this activity. If roughly 66% of Murphy's overtime was not authorized, she received approximately $184,000 of unjust compensation during a two-year period.[18] Examples of particularly egregious overtime claims include:

> <u>*Example 4: Saturday, June 10, 2023 – Sunday, June 11, 2023*</u>
> Over the course of this particular weekend, Murphy was compensated for a reported 46.5 total hours of overtime – 22.5 hours on Saturday and 24 hours on Sunday. Murphy's City email account, however, includes a receipt for tickets to a comedy show that took place at Parx Casino at 10:30PM on Saturday night, June 10, 2023. It would have been physically impossible for Murphy to have attended this event and perform such continuous voluntary overtime, as claimed. To boot, out of the 46.5 hours of paid overtime, only 26 hours included the required approval documentation – the remaining 20.5 hours were wholly unsupported by any underlying records.
>
> <u>*Example 5: Monday, September 9, 2024 – Saturday, September 14, 2024*</u>
> By all accounts, Murphy attended the EMS World Expo in Las Vegas during this week – a trip for which she had departmental approval. Email records show that Murphy *(i)* purchased tickets for a Las Vegas show that took place on September 9, *(ii)* got married on September 10,[19] *(iii)* registered to attend a political rally that took place on September 13, and *(iv)* returned to

---

[17] Because the overtime assignments varied in length.
[18] 279,839 x .66 =184,693.
[19] Official records of the Clerk of Clark County, Nevada, confirm that Murphy married Chief Tabitha Boyle in Las Vegas on September 10, 2024. ***Appendix E***.

Philadelphia on a flight that was scheduled to arrive at 5:45PM on September 14. The CQI roll calls for the week correctly recorded Murphy as absent for training, but her official timecard shows all "regular hours." And, Murphy was compensated for an additional four (4) hours of overtime on *every* day of that week, M-F, including the day of her marriage. On the date of Murphy's return, Saturday, she reported 12 more hours of overtime, despite her apparently late arrival time in Philadelphia. None of these claimed overtime assignments have *any* record of documented approval.

Understanding that the lack of an approval record may not be entirely dispositive of fraud, it is very important to note that without these documents there is no way to properly confirm her whereabouts. For overtime pay without approval, there is no record of where or when FSP Murphy may have done this work, if at all. Rather, the hours appear on her pay record with no additional context – no schedule, no location, no assignment details and nobody to confirm her activity.

***ii. In 2023 and 2024, FSP Murphy used some form of paid leave on 100 instances that were never recorded – some of these days included overtime pay without authorization.***

Comprehensive review of the CQI Unit's daily attendance records, documented on the unit roll call sheets for each week, showed significant inconsistencies when compared against Murphy's official timesheets in OnePhilly – just as with her travel to Las Vegas outlined in *Example 5*. In sum, roll call records show that FSP Murphy took some form of leave from her regular CQI post on 193 days in 2023 and 2024 combined. The roll calls for these 193 days note that Murphy was away on training leave, administrative leave, sick leave, annual leave, Act 17 leave [20] or vacation for all or a portion of the workday. Of those 193 uses of leave, 100 of them (51%) were never recorded on her official OnePhilly timesheet. Graph 3, below, shows the breakdown of this activity across the two calendar years at issue.

Graph 3: Leave Usage on Roll Calls v. OnePhilly (2023 & 2024 Combined)




[20] A 2020 extension of Heart & Lung benefits for Paramedics and Firefighters who may have suffered from COVID 19. 35 Pa.C.S., Act of April 29, 2020 (P.L. 0118, No. 17).

Obviously, due to the division of timekeeping responsibilities, the PFD's Payroll Unit is jointly responsible for these anomalies, which is discussed in greater detail below. But, the illicit benefit to FSP Murphy is very clear – she was paid for time-off without any adjustment to or consideration of ongoing leave balances or accrual policies. Moreover, on many days when FSP Murphy was recorded as out-of-office on the roll call, she also earned overtime without any authorization.

> *Example 6: Saturday, March 9, 2024 – Wednesday, March 13, 2024*
> Murphy's email records include an itinerary for a vacation to Cancun, Mexico – leaving at 6:40AM on Saturday and returning at 3:54PM on Wednesday. That same weekend Murphy reported a total of 22 hours overtime – none of which was documented on an approval form. And, although the CQI roll calls record Murphy as using vacation leave for this trip, her timesheets show all "regular hours" and four (4) hours of additional overtime on Wednesday, her apparent date of return.

In addition to *Example 6*, both *Example 2* and *Example 3* also include similar misrepresentations – days on which the CQI roll call marked her as absent but her timesheet reflected no use of leave. For each of these pay periods, Marian Farris was the recorded OnePhilly user who approved Murphy's timesheets.

*iii.* ***Former Payroll Supervisor Marian Farris manipulated FSP Murphy's federal income tax withholding status.***

Investigative review of FSP Murphy's OnePhilly records yielded an additional piece of alarming evidence related to her overall take-home compensation. Below, Table 3 presents the chronological history of FSP Murphy's federal income tax status, as recorded in OnePhilly over time.

**Table 3: OnePhilly Extract of FSP Murphy's Federal Income Tax (FIT) Status[21]**

| Effective Start Date | Effective End Date | Withholding Allowance | FIT Exempt | Last Updated Date | Last Updated By |
|---|---|---|---|---|---|
| 9/17/2018 | 3/19/2019 | 1 | N | 3/21/2019 9:48 AM | SHAUNA.BRACY |
| 3/20/2019 | 4/3/2019 | 1 | N | 4/4/2019 10:28 AM | NURIYAH.DAWKINS |
| 4/4/2019 | 3/11/2021 | 10 | N | 3/12/2021 8:36 AM | MARIAN.FARRIS |
| 3/12/2021 | 9/2/2021 | 2 | N | 9/3/2021 7:13 PM | MARIAN.FARRIS |
| 9/3/2021 | 10/7/2021 | 10 | N | 10/8/2021 9:27 AM | MARIAN.FARRIS |
| 10/8/2021 | 10/14/2021 | 2 | N | 10/15/2021 12:24 PM | MARIAN.FARRIS |
| 10/15/2021 | 11/3/2021 | 10 | N | 11/4/2021 1:46 PM | MARIAN.FARRIS |
| 11/4/2021 | 1/2/2022 | 2 | N | 2/3/2022 9:50 AM | PRINCESSCENCERAE.RAY |
| 1/3/2022 | 2/19/2022 | 2 | N | 2/20/2022 7:51 AM | MARIAN.FARRIS |
| 2/20/2022 | 4/28/2023 | 10 | N | 4/29/2023 2:25 PM | MARIAN.FARRIS |
| 4/29/2023 | 5/22/2023 | 10 | Y | 5/23/2023 11:50 AM | MARIAN.FARRIS |

[21] Raw data extract included in *Appendix F*.

| | | | | | |
|---|---|---|---|---|---|
| 5/23/2023 | 6/9/2023 | 10 | N | 6/10/2023 9:54 AM | MARIAN.FARRIS |
| 6/10/2023 | 3/10/2025 | 10 | Y | 3/11/2025 7:36 PM | NURIYAH.DAWKINS |
| 3/11/2025 | [current] | 10 | N | 3/11/2025 7:36 PM | NURIYAH.DAWKINS |

The third and fourth columns in the table above show key changes that Farris made to FSP Murphy's claimed income tax exemptions and overall tax withholding status, starting in 2021. First, Farris toggled the number of claimed exemptions between 2 and 10 at several points in recent years. These changes are frequent and do not appear to coincide with open enrollment or any other justifiable event. Second, in May and June of 2023, Farris classified FSP Murphy as "federal income tax exempt" (column 4 above). This designation in OnePhilly fully stopped *any and all* withholding from FSP Murphy's pay for a period of nearly two full years, until Nuriyah Dawkins (now Nuriyah Jordan) reset that control in March 2025.

These changes had the net effect of dramatically increasing the amount of take-home pay that FSP Murphy received during the time period at issue. To illustrate, for the pay period ending March 5, 2023, Murphy's net pay was $6,370, which included approximately 73 hours of overtime pay. For the pay period ending June 11, 2023, after Farris coded Murphy as tax exempt, her base salary and overtime hours were roughly the same but her net pay jumped to $7,645 – an increase of $1,275.[22]

The same OnePhilly extract for Marian Farris herself shows identical activity.[23] The audit trail shows that Farris unilaterally altered *her own* claimed exemptions in the same manner – frequently alternating between 10 and 1. The system also recorded at least seven (7) different occasions on which Farris toggled her own income tax status to "FIT Exempt," just like she did for Murphy.

While it is important to note that these withholding manipulations do not necessarily confirm the existence of federal tax fraud on the part of either Murphy or Farris, they are nonetheless significant evidence of the need for further investigation into the actual tax filings of these individuals for the corresponding years. Because the amount of income tax withheld was so low during these periods, it is very likely that both Murphy and Farris had significant tax liability for 2023 and 2024 at a minimum.

In fact, on October 30, 2024, the IRS sent the City of Philadelphia an official letter, identifying the City's failure to withhold any federal income taxes from Murphy's paycheck and directing the City to fix this deficiency and begin withholding as required.[24] Despite this warning, nobody adjusted Murphy's withholding status until March 2025, as noted above.

### iv. *Former Payroll Supervisor Marian Farris aided, executed and benefitted from this illicit activity.*

Given the Fire Department's structure, it is clear that none of these concerning transactions could have been accomplished by FSP Murphy alone. Because the payroll records deviate so severely from the operational records, the overtime, attendance and tax misrepresentations presented above were undoubtedly executed by an accomplice. Evidence points directly to Farris.

---

22 Paycheck comparison, *Appendix G.*
23 Raw data extract included in *Appendix H.*
24 *Appendix I.*

Consistent with the tax presentation in Table 3, OnePhilly maintains a fairly robust audit trail, recording the different users who made adjustments to FSP Murphy's record and thus inappropriately impacted her pay. OnePhilly's audit trail confirms that, in addition to the tax adjustments, Marian Farris was the regular approver of FSP Murphy's biweekly timecards. In calendar years 2023 and 2024, Marian Farris approved the large majority of these timesheets – 70 out of 102 approvals during this period are documented in OnePhilly as having been performed by Farris directly.[25]

Current and former PFD civilian employees who worked with Farris described her as one who "liked to bend the rules" and maintained friendly relationships with various paramedics and firefighters, including Murphy. Nuriyah Jordan (Jordan) worked under Farris' direct supervision during the time period under investigation. During her OIG interview, Jordan recalled that Farris would sometimes enter overtime for employees without appropriate documentation or even enter the same overtime twice – though she was unable to recall specific dates or personnel. Jordan also noted that Farris would frequently receive gifts – like jackets, shirts and children's toys – from firefighters and/or paramedics, which struck Jordan as odd.

With respect to income tax withholding, HR Manager Princess Cencerae Rae stated that Farris would regularly tell firefighters and paramedics that she could "adjust" certain payroll classifications if the employee was in need of additional take-home pay.

Lastly, and perhaps most damaging, review of Murphy's City email account shows receipts for a considerable amount of private CashApp transactions to an individual identified as "Marian F." According to these email receipts, Murphy consistently paid Farris about $500 via CashApp on a biweekly basis for at least six (6) months in 2024.[26] Most likely, these payments were in consideration for Farris' assistance with Murphy's overtime scam.

## VI. Analysis & Recommendations

In summary, the evidence collected during this investigation confirms the following facts:

- *(i)* FSP Murphy received excessive overtime compensation, much of which appears impossible to perform;
- *(ii)* The large majority of this overtime was never authorized by any uniformed PFD supervisor;
- *(iii)* FSP Murphy's official time records show significant misrepresentations, as entered by former Payroll Supervisor Marian Farris;
- *(iv)* Farris also improperly adjusted FSP Murphy's (and her own) tax withholding status to increase take-home pay; and
- *(v)* FSP Murphy gave regular cash payments to Farris.

Taken together, there is only one reasonable conclusion: Murphy and Farris worked together to defraud the City of Philadelphia of thousands of dollars in unearned compensation and other benefits. Clearly, this conduct carries heavy administrative and criminal consequences, and the OIG therefore recommends the following action steps:

---

[25] ***Appendix J*** shows all timecard approvals performed by Farris in 2023 and 2024.
[26] A sample of these email receipts can be found in ***Appendix K***.

1. ***Dismiss FSP Murphy from employment, following all required disciplinary procedures, and withhold terminal pay.***

Civil Service Regulation 17.02 states that any Civil Service employee may be dismissed for "just cause." Employment discipline imposed by the City must be upheld if there is "sufficient, probative, substantial evidence to conclude that there was just cause for dismissal." To be sufficient "all the law requires is that the cause be not religious or political, but concerned solely with the inefficiency, delinquency or misconduct of the employee." *Appeal of Cornelius Thompson, Jr.*, City of Philadelphia Civil Service Commission, Case No. 5139, January 16, 2014.

As presented in this report, the objective evidence of FSP Murphy's misconduct is incontrovertible.

Accordingly, the OIG recommends her immediate dismissal from employment. To do so, the Fire Department should follow all processes and procedures as required by law and applicable Collective Bargaining Agreements, to include requisite notice and a department-level hearing.

Given the financial implications of Murphy's conduct, the OIG also recommends that the City withhold any terminal pay that may be otherwise owed upon separation, in an effort to secure restitution.[27]

2. ***Reorganize, restaff and retrain the Fire Department's Human Resources and Payroll Units.***

In addition to the documented evidence of misconduct identified throughout this report, OIG interviews of the PFD administrative staff yielded some especially concerning narrative accounts of Farris' activity in the group. Employees recalled very close relationships, inappropriate gifts, open statements about improper payroll adjustments, as well as clear policy and process deviations as a matter of general practice and workplace culture. There is an obvious need to correct this moving forward.

The OIG defers to the Personnel Director with respect to civilian employee discipline, understanding that some may have failed to make timely reports of wrongdoing, but it seems clear that the entire payroll function within the Fire Department has been compromised for some time. Accordingly, the OIG recommends that the civilian administrative units within the Fire Department be wholly reorganized and restaffed with external personnel who do not have any historical relationship to or direct knowledge of this activity. Each employee should be trained on appropriate payroll procedures, division of responsibilities, reporting obligations and the like. Such realignment will help protect the Fire Department from any risk that similar misconduct could continue or resurface in the future.

3. ***Strengthen department-level overtime controls and more regularly audit City-wide overtime accruals.***

With respect to City-wide internal controls, there are two (2) key points to emphasize. First, Murphy's overtime accruals were extremely high – without consideration of any other evidence – and saw significant and unusual spikes at various points in time. For a headquarters employee with purely administrative job duties and no in-unit overtime opportunities, this simple fact should have alerted leadership to a need for deeper review. Of course, the amount of overtime alone is never dispositive, but

---

[27] Upon Farris' resignation, the City similarly withheld terminal pay, considering the probability of financial loss. The OIG recommends that this compensation be retained indefinitely as well.

it is a clear indicator of possible misconduct and/or a need to realign personnel or job responsibilities as a matter of fiscal stewardship.

Second, the technical security features in the City's payroll system failed because Marian Farris was able to unilaterally make these nefarious adjustments without any additional level of supervisory review. Ideally, any of Farris' timekeeping adjustments should have been reviewed and approved (or rejected) at a second level – if this had been done at any point, there would have been a much better opportunity to identify the fact that overtime lacked approval documentation and timesheets were woefully inconsistent with the unit-level attendance records.

Because this investigation required significant data from the OnePhilly system, OIG investigators worked closely with the City's Office of Human Resources to collect and analyze system data sets. Accordingly, OHR is well aware of these internal control failures and, in August 2024, introduced new City-wide accountability measures to include: *(i)* department level trend analysis, *(ii)* department head accountability and oversight; *(iii)* automatic system alerts and *(iv)* central monitoring and adjustment of payroll system roles and tax withholding controls.[28] The OIG credits the introduction of these robust controls as responsive and offers no additional City-wide recommendations at this time.

Within the Fire Department, however, the SharePoint site for internal documentation must be more carefully maintained and more closely monitored. A ranking officer, perhaps the PFD's Special Investigations Officer, should regularly perform some level of periodic audit of this system to ensure that roll calls match timesheets and overtime approvals are present without exception.

---

This investigation remains ongoing to seek criminal prosecution jointly with law enforcement and further assess the scope of activity within the Fire Department.

In connection with any subsequent criminal or civil action, the OIG will seek full restitution for any financial loss that the City may have incurred, including but not limited to unearned overtime compensation.

---

[28] *Appendix L.*

## APPENDIX

A. Fire Department Audit (January 2025)

B. M. Farris Resignation Letter (March 2025)

C. Example PFD Weekly Roll Call

D. Example PFD Overtime Approval Form

E. Nevada Marriage Record (September 2024)

F. OnePhilly Income Tax Withholding History, J. Murphy (various)

G. Paycheck Comparison (March 2024, June 2024)

H. OnePhilly Income Tax Withholding History, M. Farris (various)

I. IRS Withholding Letter (October 2024)

J. OnePhilly Timecard Approvals, J. Murphy (various)

K. CashApp Receipts - City email (various)

L. City-Wide Overtime Control Process (August 2025)

| Member | # Total | # Underpaid | # Overpaid & OT Sheet Missing | # Paid Properly | Accuracy Rate |
|---|---|---|---|---|---|
| Davis, Keith | 33 | 2 | 0 | 31 | 94% |
| Farley, Raymond | 23 | 0 | 0 | 23 | 100% |
| Gilmore, Joseph | 8 | 0 | 1 | 7 | 88% |
| Jablonski, Beth Ann | 3 | 0 | 0 | 3 | 100% |
| Murphy, Jacqulyn | 286 | 0 | 232 | 54 | 19% |
| Pearson, Janet | 25 | 1 | 0 | 24 | 96% |
| Schurr, Jeffrey | 34 | 1 | 1 | 32 | 94% |
| Stahl, William | 10 | 0 | 0 | 10 | 100% |
| Toganov, Alexander | 47 | 0 | 1 | 46 | 98% |

| Member | # Total | # Leave Not Posted | # Leave Charged Incorrectly | # Posted Properly | Accuracy Rate |
|---|---|---|---|---|---|
| Davis, Keith | 16 | 0 | 0 | 16 | 100% |
| Farley, Raymond | 38 | 5 | 0 | 33 | 87% |
| Gilmore, Joseph | 16 | 4 | 0 | 12 | 75% |
| Jablonski, Beth Ann | 2 | 2 | 0 | 0 | 0% |
| Murphy, Jacqulyn | 85 | 56 | 0 | 29 | 34% |
| Pearson, Janet | 33 | 0 | 0 | 33 | 100% |
| Schurr, Jeffrey | 25 | 0 | 0 | 25 | 100% |
| Stahl, William | 42 | 9 | 0 | 33 | 79% |
| Toganov, Alexander | 24 | 1 | 1 | 22 | 92% |

A