# EXHIBIT D

CAMPBELL DURRANT, P.C.
PUBLIC SECTOR, LABOR AND EMPLOYMENT LAW

**MEMORANDUM**

TO: Elizabeth Martin, Employee and Labor Relations Administrator

CC: Cara E. Leheny, Esquire, Director, Office of Labor Relations

FROM: Tiffany R. Allen, Esquire
Benjamin R. Patchen, Esquire

DATE: June 17, 2025

RE: Investigation Related to Complaints Against Deputy Fire Commissioner Anthony Hudgins

---

The City of Philadelphia ("City") retained this law firm to investigate the individual allegations made by several female uniformed and civilian employees against Deputy Commissioner Anthony Hudgins ("Hudgins"), a 30-year veteran of the Philadelphia Fire Department. The complaints were submitted to the City's Employee Relations Unit ("ERU") and forwarded to this firm for review and investigation. The allegations against Hudgins range from unwanted physical contact, such as excessive and inappropriate hugs, to offensive comments, micromanagement, and retaliation. As summarized in detail below, a significant number of the most serious allegations were unfounded for reasons specific to those complainants. However, several recommendations for training and policy development follow this investigation as a result of the general findings about office culture failing to meet professional management and office standards.

**BACKGROUND AND PROCESS**

Rose Smith-DiFrancesco received complaints from Michael Bresnan, president of International Fire Fighters and Paramedic Union Local 22 of the ("IAFF") on November 8, 2024. The complaints compiled by IAFF and submitted by Bresnan included brief summaries of the allegations against Hudgins and included contact information for the complainants and witnesses.

The City Law Department, on behalf of the ERU, engaged this firm on December 2, 2024, to investigate the complaints. Our investigation commenced on December 17, 2024.

In preparation for the interviews summarized throughout this report, the investigation included review of the emails exchanged between DiFrancesco and Bresnan, text messages Jacqulyn Murphy ("Murphy") received from an anonymous source along with images uploaded on social

media of Murphy and her son as an infant with Battalion Chief Bowmer's[1] face transposed on the son's face, an image of Murphy's face copied to an image of the Fire Administration Building and red markings around, as well as documents maintained by Hudgins relating to his investigation of the Department's overtime usage.

We also interviewed the following City uniformed and civilian employees[2]:

1. Nuriyah Jordan on December 17, 2024
2. Dana Jackson on December 17, 2024
3. Paramedic Chief Tabitha Boyle on December 18, 2024
4. Paramedic Jacqulyn Murphy on December 18, 2024, and January 17, 2025
5. Paramedic Mary Preston on December 18, 2024
6. Paramedic Amanda Mitchell on December 19, 2024
7. Marian Farris on December 20, 2024
8. Paramedic Kelly (Boylan) McCrory on December 20, 2024
9. Paramedic Hilda Bradshaw on January 8, 2025
10. Deputy Commissioner Anthony Hudgins on January 29, 2025
11. Margurite Morgan on February 13, 2025
12. Paramedic Corrina Cosenza on March 10, 2025
13. Deputy Chief Michael Richey on March 12, 2025
14. Battalion Chief Derek Bowmer on March 14, 2025
15. Former Fire Commissioner Craig Murphy on March 18, 2025
16. Aide Christina Quinones on April 7, 2025

## INVESTIGATION

As outlined in detail below, Hudgins is accused of inappropriate behavior towards multiple employees, ranging from unwanted physical contact, such as excessive hugs, to inappropriate comments and micromanagement. Many of the complaints related to unwelcome touching, particularly Hudgins's penchant for hugging female employees in a way that made them feel uncomfortable and obliged to engage because of his rank in the Department. The allegations also include inappropriate sexual comments Hudgins made to Murphy and Tabitha Boyle ("Boyle"), a married couple, and Hudgins' alleged desire to see them engage in sexual acts with each other and his wife. Although several of the complainants and witnesses had some experience with Hudgins hugging them, the more egregious complaints against Hudgins involve the alleged sexual comments made to Murphy and Boyle. Except for the hugging allegations, the more serious sexual allegations are uncorroborated by anyone besides Murphy and Boyle, a married couple, while Murphy is the subject of an overtime fraud investigation.

Hudgins denied allegations of sexual harassment and misconduct. He asserted his commitment to fair treatment and denied making inappropriate comments or that he engaged in unprofessional

---

[1] Murphy claimed during her interview that she was once romantically involved with Battalion Chief Bowmer. Bowmer denied Murphy's claim.

[2] All interviews were audio recorded in compliance with the PA Wiretap Law. A copy is available upon request.

behavior. Hudgins emphasized his efforts to address employee concerns and promote a positive work environment. Hudgins addressed the claim of inappropriate workplace greetings, including hugs, and denied unsuitable behavior towards Murphy, Boyle, and others.

Hudgins stated that the harassment complaints against him are retaliatory, stemming from his investigation into excessive overtime use. He reported that he investigated records of excessive overtime pay, particularly for Jacqulyn Murphy, Mary Preston, and others, and discovered not only a lack of documentation to support the claimed overtime but that Payroll Manager Marian Farris used system overrides to enter their hours. Corrina Cosenza, Hudgins' aide, corroborated his statements, describing him as respectful and professional, and noted that the workplace atmosphere changed after Hudgins raised concerns about payroll inconsistencies and excessive overtime by employees assigned to their location.

Battalion Chief Derek Bowmer, who has worked closely with Hudgins for 22 years, reported that he never witnessed inappropriate behavior from Hudgins. He described Hudgins as friendly but professional, noting that his workplace relationships were amicable until employees learned about his overtime investigation involving Jacqulyn Murphy then tensions escalated.

## Summary of Witness Interviews

### Nuriyah Jordan

Nuriyah Jordan, a 15-year Fire Department employee, currently works as a payroll supervisor overseeing approximately half of the department's payroll, or about 1,500 personnel. She began experiencing inappropriate conduct from Hudgins in 2022 after both were assigned to the Fire Administration Building ("FAB"), with Jordan's cubicle located just 10–20 feet from Hudgins' office. Despite the significant difference in rank, they had frequent daily interactions.

The first alleged incident occurred when Jordan and another payroll supervisor, Marian Farris, discussed Farris's new exercise regimen. Hudgins inserted himself into the conversation and made an inappropriate remark about his physical features, claiming his best features were his teeth and thighs. As he referenced his thighs, he ran his hands up his legs and grabbed his crotch, causing discomfort to both women and ending the conversation.

A second incident took place in mid-2022, when Jordan was called into Hudgins' office to brief him on payroll ahead of a meeting. During this professional interaction, Hudgins began changing his shirt and dropped his pants to tuck in his shirt. Jordan, though shocked, remained professional and continued the briefing. She later informed a colleague, Angela Avenger, but did not report it formally at the time. She began documenting incidents after this encounter.

On August 9, 2022, two further incidents occurred. In the first, as Jordan descended stairs wearing a dress and cardigan, Hudgins passed by and closed her cardigan for her, brushing his hand against her breast and saying, "I'm still a man." Later that same day, as she exited the building, she held the door open for Hudgins and made a lighthearted comment referring to office banter. Hudgins responded with, "Keep being nice and wearing that dress," a remark Jordan found inappropriate. This was reportedly witnessed by his then-aide, Jeffrey Stowe.

The following day, August 10, while Jordan was in a colleague's cubicle, Hudgins walked by, then backtracked and blew her a kiss. Upset, Jordan expressed her intention to address his behavior, but her colleague advised against approaching him alone.

On August 11, Jordan formally reported the incidents to Hudgins' supervisor, Commissioner Craig Murphy. Jordan does not state what, if any, details she relayed to Murphy about Hudgins' behavior towards her. Jordan recalled that Murphy asked if she wanted to file a formal complaint ("take it downtown"), but Jordan said she simply wanted Hudgins to stop. Murphy said he would talk to Hudgins.

On August 12, Hudgins called Jordan into his office, this time with the door open, and denied remembering if he blew a kiss but emphasized his love for his wife and questioned why she had not come to him directly. He did not apologize. This conversation lasted approximately ten minutes. Afterward, Jordan did not experience further personal misconduct from Hudgins.

Jordan has not observed Hudgins act inappropriately towards other employees but she has heard of other concerning behavior from Hudgins involving additional employees. Debra Mannix, a secretary, told Jordan that Hudgins had tried to feed her and commented that he had "one of [her] at home," referencing his Caucasian wife. Chief Christopher Bill told Jordan that Hudgins had once smacked him on the buttocks while serving as Car 3. Jordan believes other employees felt comfortable sharing their experiences with her due to her history with Hudgins.

Jordan also expressed concerns about the Human Resources unit, which was under Hudgins's supervision. She stated HR was ineffective and lacked confidentiality. The emotional toll from these experiences has affected her both professionally and personally. She suspects Hudgins may have retaliated after her report to Commissioner Murphy by spreading a rumor that she was stealing from the department. Victoria Lewis allegedly contacted Angela Avenger with this accusation. Although Jordan could not confirm if Hudgins contacted Lewis directly, she knew he had spoken to Shauna Bracey and Crystal Yates regarding this information.

**Dana Jackson**

Dana Jackson, currently the Professional Standards Officer and Director of Diversity, Equity, and Inclusion for the City of Philadelphia Fire Department, has held this position for over two years. Her responsibilities include ensuring compliance with anti-discrimination laws and fostering a welcoming workplace culture. Prior to this, she worked for the Commonwealth of Pennsylvania for about 15 years. Jackson first became aware of complaints against then-Chief Hudgins through former Commissioner Craig Murphy, who told her that the late Firefighter Joyce Craig had filed a sexual harassment complaint against Hudgins roughly a decade ago. Jackson does not think that the complaint was taken seriously. Jackson disclosed to Commissioner Murphy that Hudgins made her feel extremely uncomfortable and interfered with her ability to work. She recalled specific incidents, including one in March 2023, when Hudgins stood inappropriately close to her in a private office, causing discomfort and concern over confidentiality.

Additionally, Jackson received a complaint from Mary Preston stating that Hudgins had made comments about Jackson's breasts, and Jackson herself felt as though Hudgins was "undressing" her with his eyes. She also described how Hudgins repeatedly tried to create unnecessary one-on-one interactions, including unannounced office visits and meetings without agendas, which she considered inappropriate.

On one occasion, Hudgins told Jackson she could not contact the Managing Director's Office, a directive she believed was in retaliation for sending a symposium invitation to a former Commissioner. As head of HR, Hudgins also allegedly hindered her work by withholding access to necessary systems and delaying her receipt of an office until 2024. In November 2024, Jackson documented concerns raised by Jacqulyn Murphy and Mary Preston. She also received reports from Nicole Munson that Hudgins had removed his shirt in front of her and made inappropriate comments, echoed by complaints from Debbie Mannix, who declined to file formally. On December 16, 2024, Jackson filed an internal complaint with the Special Investigations Office and submitted an EEOC complaint on Jacqulyn Murphy's behalf.

**Tabitha Boyle**

Chief Tabitha Boyle, a veteran of the Philadelphia Fire Department since 2007, currently serves as Fire Paramedic Chief, overseeing a portion of the city's EMS personnel. Transferred to her current role in November 2024, she previously worked at the Special Investigations Office, where she regularly encountered Hudgins. Boyle described her early professional relationship with Hudgins as "good," but noted a change as he rose in rank, becoming more arrogant and inappropriate. She described frequent and prolonged hugs initiated by Hudgins, despite her discomfort and attempts to avoid them, which she believed were used as an excuse for inappropriate physical contact. Hudgins also made frequent sexual comments, including remarks about women's breasts, inappropriate jokes, and invasive behavior such as touching her hair and making vulgar references to his wife. Boyle stated that this behavior persisted from around 2021 until Hudgins became aware of formal complaints, at which point the hugging stopped. She recounted additional disturbing conduct, such as Hudgins expressing excitement about looking down a female employee's shirt, mocking Dana Jackson's appearance, and allegedly isolating women to make inappropriate advances.

Specifically, Boyle recalled numerous occasions where Hudgins greeted either her with a hug for an extended period of time, controlling the length of the hug, and preventing her from pulling away. Boyle stated that a hug is Hudgins' normal greeting for female employees and that he "doesn't take no for an answer" when women attempt to decline the physical contact. Boyle estimated that Hudgins has hugged her hundreds of time, noting that it occurs "every time that [she has] ever seen him."

Additionally, Boyle stated that if she attempted to "give [Hudgins] a side hug," he would physically turn her to face him before hugging her. Boyle further stated that Hudgins has commented on women's breasts around the office in both a positive and negative manner, and Hudgins' drawn-out hugs were commonly understood by female personnel as a means for Hudgins to inconspicuously touch their breasts.

Boyle alleges that after complaints against Hudgins were filed and Hudgins got word of those complaints, Hudgins joked with others that he "wasn't allowed to hug people anymore." Boyle noted that, while she was still assigned to the FAB, Hudgins stopped greeting people with hugs after complaints were filed against him. Boyle noted that Hudgins' uncomfortable hugs occurred daily from about 2021 until Hudgins learned that complaints had been filed against him. She noted that hugging was Hudgins' regular greeting for conventionally attractive women throughout the Department. Boyle noted that, although Hudgins actions made her uncomfortable, "there was a certain level of harassment we all seemed to put up with in the Fire Department..., especially with somebody as powerful as Chief Hudgins." Boyle noted that "a lot of us are reluctant to talk about things he does that are inappropriate."

Next, Boyle recalled that on several occasions in or around 2021, Hudgins would touch and/or caress Boyle's hair, comment on her hairstyle, and ask her when she was going to cut it again. Eventually, Hudgins mentioned to Boyle that he could cut hair and volunteered that he had cut his wife's hair while motioning towards his crotch area. He also referenced the "designs" that he had cut into his wife's pubic hair.

Boyle recalled an instance in the summer of 2021 where Hudgins commented with excitement about his ability to nearly look down the shirt of Marian Farris, a female employee. Then, sometime in October 2021, Hudgins commented negatively about Dana Jackson's breasts following an unrelated work dispute. Boyle overheard the comment that Hudgins made to one of his aides.

Boyle explained that Hudgins' inappropriate touching sometimes occurs in the presence of other employees, but "mostly his aides who are loyal to him...who he trusts." However, Hudgins often isolates individuals before making sexual or inappropriate comments or advances. She stated, "he likes pulling you aside privately...or taking you for a walk around the entire city block."

Boyle has recently gone back to school. She asserted that her leave of absence for school was denied, largely at the advice of Deputy Commissioner Hudgins. Although the Commissioner was the final decision-maker in the matter, Boyle noted that the Commissioner, who had never handled a leave of absence request before, heavily relied on Hudgins' opinion in denying Boyle's request. In denying Boyle's request, Hudgins stated that the Department does not grant those kinds of requests; however, a union representative informed Boyle that Hudgins' assertion is false. The union encouraged Boyle to resubmit her request for a leave of absence, but she stated that she is "making it work" without the requested leave by using her personal time.

Boyle disclosed that she is a gay woman who is open about her sexuality amongst coworkers. In September 2024, Boyle married Jacqulyn Murphy, another paramedic in the Department. After Boyle and Murphy returned from leave after getting married, Hudgins and "all the commissioners" began making jokes about their relationship. Hudgins and others called Murphy and Boyle "Chuck and Larry," referencing a movie where two male firefighters get married for insurance purposes. Boyle stated that both she and Murphy asked Hudgins and others to stop making the Chuck and Larry jokes. However, Hudgins simply laughed and dismissed the request as a joke.

Boyle recalled that on September 10, 2024, she was out on leave for her wedding, Hudgins demanded a memo explaining her use of holiday time for the Labor Day holiday the preceding week. Boyle was told that if she did not provide that memo, she would not be paid for Labor Day. Boyle stated that she could not recall a single past instance where "a chief was harassed on their off time for paperwork for using paid time off." On another occasion while Boyle was still stationed at the special investigations office, Hudgins told Boyle and Jacqulyn Murphy that he wanted to take them on vacation. Additionally, since Boyle and Murphy married, Hudgins made multiple statements or insinuations that he "wants to watch" Boyle and Murphy being intimate.

Boyle noted that Hudgins "has always been flirty," but his approaches have been "much more [aggressive] since his new position." She stated that, before being transferred out of the SIO, she began "avoiding [Hudgins] as much as possible" to avoid his inappropriate conduct.

On Monday, September 23, 2024, Hudgins approached Boyle while she was alone in the outside smoking area and insisted that she "take a walk" with him. During the conversation, Hudgins insinuated that Boyle had asked for a special favor by making a request for an unpaid leave of absence related to attending school.

Boyle also described what she considers professional retaliation after seeking unpaid leave to attend school, a request denied under Hudgins' influence. She reported being singled out for documentation over use of paid time off during her wedding leaves, something she had not seen happen to others in similar positions.

Since her transfer, Boyle has not been privy to the comments from Hudgins or others. Boyle emphasized how the inappropriate comments and harassment from Hudgins have caused immense stress for Murphy both in and out of work.

Because of Hudgins' powerful position, Boyle and Murphy filed their complaints through the union rather than the department's chain of command. Boyle explained that Hudgins' behavior created a culture of tolerated harassment, especially given his high-ranking role and influence over personnel decisions. Boyle also mentioned that Murphy and Dana Jackson had notified the Commissioner directly about Hudgins' conduct, and that the Commissioner indicated he would "get rid of" Hudgins once formal complaints were submitted. Boyle concluded by stating that Hudgins had a known history of harassment, citing reports from around 2013 involving the late Firefighter Joyce Craig, who was later transferred to another station before she died in the line of duty.

**Jacqulyn Murphy (two interviews)**

Jacqulyn Murphy, a Fire Service Paramedic with over 16 years in the Philadelphia Fire Department, has spent the last seven years assigned to the EMS Administrative Staff, reporting directly to Chief Raymond Farley. Her primary duties involve continuous quality improvement, which includes reviewing medical documentation and personnel files during transfer processes. Murphy began experiencing issues at work in mid-2024 after reviewing a list of EMTs who Chief

Russel Bryant wanted to transfer.[3] She flagged two candidates for prior disciplinary issues, which reportedly angered Bryant. While Murphy was on bereavement leave, Bryant allegedly berated her in front of others, and upon her return, made disparaging remarks about her within earshot of her colleagues. Though she reported this behavior to Farley, and Bryant's direct interactions decreased, she still faced ongoing tension and whispered criticisms.

Murphy also described a pattern of inappropriate and increasing sexual behavior from Hudgins. She detailed years of unsolicited, prolonged, and physically invasive hugs, which often involved Hudgins holding her close, rubbing her back or hair, and forcing frontal embraces, even after she attempted to avoid them. Witnesses were occasionally present, but Hudgins was described as skilled at isolating individuals. After Murphy married her partner, Tabitha Boyle, in September 2024, Hudgins made overtly sexual comments about their relationship, including stating that he wanted to "watch" them and making crude remarks about her body. He also shared inappropriate personal anecdotes, including details about grooming his wife's pubic hair.

Murphy believes Hudgins retaliated against her after she rebuffed his advances and expressed discomfort. He initiated an overtime investigation against her, which she believes was baseless and discriminatory, as no other employees' records were scrutinized. She stated that her overtime practices had not changed and that her requests were always approved through proper channels. Hudgins allegedly shared details of this investigation with others, despite telling Murphy to keep it confidential. Additionally, Hudgins and others, including Derek Bowmer, made derogatory jokes after Murphy's marriage, likening her relationship to the film *Chuck and Larry*. Murphy felt that the comment was "disgusting" when it came from Hudgins but when Bowmer made the same comment, she considered it to be a joke and made with no ill-intent.

Murphy also reported racial undertones in Hudgins' comments, particularly regarding her open relationship with another City employee, Kendrick Long, whom Hudgins referred to as "their Black boyfriend." She believes Hudgins' aide later filed a retaliatory complaint against Long related to a denied leave request for Boyle. In December 2024, Murphy formally submitted a written complaint against Hudgins, noting that she had previously avoided doing so out of hope that the behavior would stop. She is now pursuing a federal lawsuit. In the meantime, workplace conditions have worsened, Hudgins imposed stricter attendance policies that disproportionately affect Murphy's office, requiring five-day in-person attendance and docking time for tardiness. Murphy reported that the atmosphere has become so uncomfortable and tense that she has been using leave frequently, and even her attempt to teach at the Academy was dismissed by Bowmer with the comment, "You guys had your turn. It is our turn now."

Jacqulyn Murphy participated in a second interview on January 17, 2025, to address incidents she perceived as retaliatory following her initial interview on December 18, 2024. The day after that first meeting, Murphy attended a scheduled session with Nina Lane regarding an internal complaint she had filed against Chief Bryant, during which she expressed that she did not feel comfortable being in the same building as Bryant. After this meeting, Murphy visited Professional Standards Officer Dana Jackson, who had previously assisted with her complaint, to update her on what Murphy described as escalating hostility from Bryant. Captain Mary Preston accompanied

---

[3] Complaints about Russel Bryant were not the focus of this investigation. These issues were reported to the City for internal review and disposition.

her and also shared her concerns. Murphy reported that just before her December 2024 interview, Bryant had made a threatening statement about Preston, telling Captain Jablonski that he had "a lot of family that loved him and were ready to deal with Preston with just a phone call." Murphy interpreted this as a deliberate message, believing Bryant said it in front of Jablonski to ensure it would reach Preston.

Murphy also described what she viewed as surveillance behavior by Bryant toward the end of 2024. Although detailed to the warehouse for logistics work, Murphy stated that after discussing her schedule with her Captain that Bryant appeared at the warehouse and asked for her location. Murphy interpreted this as an inappropriate attempt to track her, especially since she is not in Bryant's chain of command. On December 19, 2024, Murphy reported overhearing Bryant say to another individual, "she put in a complaint against me," which she believed followed a meeting between Bryant and Deputy Commissioner Martin McCall. Murphy stated that Lieutenant Chrissy Savario informed her that McCall had disclosed her EEOC complaint to Bryant, which she viewed as a breach of confidentiality. She also noted that while Bryant was instructed to work from another building, he has instead been working from home, a level of schedule flexibility she feels has been denied to her unit alone. According to Murphy, aides to Hudgins have been marked present despite being absent, further compounding her concerns about inconsistent enforcement of attendance policies.

On December 30, 2024, Murphy received screenshots of memes featuring a 2018 Facebook photo of herself and her son that had been altered and circulated around the Department and on a department-affiliated Facebook page before its removal. One meme had Battalion Chief Bowmer's face transposed over her son's face, while others featured her own face from the same image. Murphy stated that at least five employees asked her about the memes, which she believes were widely shared within the Department. She reported these memes to Nina Lane, expressing concern about confidentiality breaches, particularly after learning that Bryant was aware of her complaint. Lane allegedly responded by downplaying the incident, saying Murphy should not let it bother her. Murphy later informed Commissioner Thompson about the memes, and she suspects his involvement prompted Lane to follow up by requesting the memes via email. Murphy further believes that Bryant may have instigated a complaint alleging that she was earning excessive pay. While Murphy acknowledged her schedule is 8:00 a.m. to 4:30 p.m. Monday through Friday, she stated she often works overtime and does not have the authority to approve it herself; her overtime is approved through the standard chain of command.

Murphy additionally reported that Bryant has a history of violent and problematic behavior, citing an incident in which he allegedly punched former EMT Ashley Sanchez in the face and avoided disciplinary action due to influential allies. During the week of Christmas 2024, Murphy noticed a car parked outside her home in the early morning hours for three consecutive nights, though she could not confirm who it was. She expressed a lack of confidence in the Department's internal investigation into her EEOC complaint, noting that while she believes Nina Lane has begun interviewing employees, she has not received any updates. According to Murphy, Commissioner McCall told her that Bryant could not be removed from his current unit unless an employee within the Mobile Integrated Health unit filed a complaint against him, as Bryant does not report directly to McCall. As of early 2025, Murphy reported using one to three sick or vacation days each week to avoid contact with Bryant.

**Mary Preston**

Mary Preston, a veteran employee of the Philadelphia Fire Department with nearly 20 years of service, currently serves as a Fire Service Paramedic Captain and has held this rank for two years. For the past four years, she has been stationed at the Administration Building working under Deputy Commissioner Martin McCall alongside other personnel, including Jacqulyn Murphy and Hudgins. Preston has known Hudgins for many years and described a previously positive working relationship that shifted following his promotion to First Deputy Commissioner ("Car 2") after the appointment of Commissioner Thompson. As Car 2, Hudgins oversees all other "Cars" within the Department's administrative structure.

In August 2024, Preston was informed by her supervisor, Deputy Commissioner McCall, that Hudgins had raised concerns regarding her and her colleague, Ken Stacey's, overtime usage. Despite Preston's extensive duties, which include managing the EMS Review Board, conducting training, overseeing special projects, and handling personnel transfers, Hudgins never approached her directly to understand the nature of her workload or the justification for her overtime. Instead, he repeatedly contacted the head of payroll to access Preston's time and attendance records. Preston sought advice from her union representative, Diane McKensie, in response to this scrutiny. She emphasized that overtime is necessary to fulfill her responsibilities, especially given the operational demands placed on EMS. She also noted a longstanding disparity in how EMS is treated compared to the fire division, which Hudgins oversees, and expressed concern that the targeting of her overtime is part of a broader pattern of discrimination against EMS staff due to their recent success and visibility.

Preston described a shift in Hudgins' demeanor and behavior after the marriage of two coworkers, characterizing his subsequent interactions as increasingly inappropriate. She recalled instances in which Hudgins made unsolicited physical contact, such as asking for and initiating a two-armed, front-facing hug, which she found uncomfortable and inappropriate. He also made comments on her appearance, such as telling her she "looked really good" during a formal meeting, leaving her unsure how to interpret his intentions. These behaviors coincided with broader concerns Preston raised about hostile conduct from another senior official, Fire Paramedic Service Chief Russell Bryant. According to Preston, Bryant has a pattern of making degrading comments, particularly toward women, including a deeply hurtful accusation that her professional growth was attributable to her having a daughter with special needs. She stated that these comments caused profound emotional distress and that she avoids being alone with Bryant due to discomfort and fear. Preston also suspects that Bryant's personal animosity may have prompted Hudgins' interest in her overtime records, given Hudgins' friendship with Bryant.

Preston reported additional professional conflicts with Bryant, particularly surrounding personnel vetting. Traditionally, Preston is involved in this process due to her access to relevant information. However, Bryant deliberately excluded her, and when another employee, Jacqulyn Murphy, consulted Preston during a vetting process, Bryant reacted angrily. Upon Murphy's return from

bereavement leave, Bryant confronted her aggressively for involving Preston, further evidencing what Preston views as targeted exclusion and intimidation.

On November 6, 2024, Hudgins summoned Preston to his office near the end of the workday. After initially being unavailable, he asked Preston, through Deputy Commissioner McCall, to meet him at his vehicle. Preston complied and was then instructed to get into the car, which Hudgins drove around the block before parking. During this 30 to 40-minute conversation in Hudgins' car, Hudgins engaged in a disjointed and inappropriate conversation that included personal questions, grievances about other staff members (particularly Murphy and Boyle), insinuations about personal relationships among staff, and unsubstantiated accusations that certain employees were falsifying time records. He also made an inappropriate comment about a female employee's body and made a racially charged claim that the warehouse "doesn't hire Black people," which Preston promptly challenged by naming diverse staff members. Toward the end of the conversation, Hudgins questioned Preston's authority to sign documents on behalf of McCall. Though she clarified that she had McCall's permission, Hudgins directed her to stop, even as he admitted that his own aide signs on his behalf. Preston described leaving the vehicle confused and disturbed, later describing the interaction as an attempt by Hudgins to "get something" from her. She immediately reported the incident to McCall and her union representative.

Since the November 6 incident, Preston has refrained from putting in for overtime due to fear of retaliation, interpreting Hudgins' actions as a form of bullying. The following day, she was informed that Hudgins had again accessed her time records without explanation. Union leadership has since advised Preston not to engage in any one-on-one conversations with Hudgins and to document all future interactions. Preston stated that she now feels intimidated and fearful at work, expressing concern over potential retaliation from both Hudgins and Bryant.

**Amanda Mitchell**

Amanda Mitchell, a firefighter with nine years of service in the Philadelphia Fire Department, has been assigned to the Academy for approximately three years, initially detailed there during her pregnancy. Following the birth of her child, Mitchell obtained a doctor's note requesting continued light duty due to her need to pump breast milk every two hours, a request her supervisors accommodated without issue. Her performance was considered strong enough that she was temporarily assigned as Acting Lieutenant.

In August 2023, Hudgins unexpectedly pulled Mitchell aside for a private conversation, their first interaction ever. During this encounter, Hudgins questioned why she was still assigned to the Academy and, upon learning she was breastfeeding, dismissed her medical accommodation, asserting that "breasts are not a reason to be light active duty" and that "there's no such thing as light active duty for breastfeeding." Despite Mitchell explaining that she had a doctor's note, Hudgins insisted she obtain a new note clearing her for full duty. Mitchell found the exchange particularly troubling because she knew of at least three other breastfeeding women working light duty at the Academy who were not similarly confronted by Hudgins.

Hudgins also expressed disdain for the frequency of pumping breaks, accusing Mitchell and other breastfeeding employees of abusing the system and remarking that "you people take all this time."

He emphasized the use of departmental pumping stations, described by Mitchell as unsanitary and akin to "porta potties," and seemed angered to learn that her assignment had been approved by Chief Bowmer. Upon hearing Bowmer's name, Hudgins reportedly cursed, shouting "f*ck Bowmer," and launched into a tirade about his power, education, and influence within the Department. Mitchell stated that Hudgins ended the conversation by saying he would check in on her every 90 days and warned Mitchell not to tell anyone about their discussion or "it would be the last nice conversation" they had. Nevertheless, some coworkers had seen Hudgins pull her away and were already aware something had happened.

Mitchell said that she feared reassignment which would disrupt her family's routine. Mitchell reported the incident immediately to her then-Lieutenant, John Myers. Myers agreed the conversation was inappropriate and suggested union representation should have been present. Myers relayed the concern to Deputy Chief Mike Richie. Mitchell also told her husband, Captain Chris Mitchell, who serves in the Technical Support Unit. Mitchell said that her husband approached Hudgins directly and asked him to stay away from his wife. Mitchell recounted that Chief Bowmer visited the Academy to apologize to her for Hudgins' behavior and said that the conversation should never have occurred.

Mitchell said that Hudgins later confronted Mitchell again in September 2023 during a tour of the Academy with City Council members. He approached her in front of others, insisted on a hug, and made comments about her assignment, suggesting it "might not work out," and remarked that it was "really a Lieutenant spot." When Mitchell informed him that she had passed the Lieutenant's test, Hudgins responded dismissively, saying, "you actually passed that thing?", a comment Mitchell found demeaning. At the end of that encounter, he again asked for a hug, which she reluctantly gave out of concern for appearances.

Mitchell noted that while hugs are common in the Department, Hudgins' hugs are "creepy.". She feels unable to refuse them due to his rank and power, fearing career retaliation. Mitchell expressed concern that speaking out could make "the next 20 years of [her] career a living hell."

Mitchell discussed with Jacqulyn Murphy the investigation into Hudgins, during which they shared their individual experiences. Mitchell stated that gossip about Hudgins' conduct is widespread at the Academy, with rumors ranging from inappropriate touching and comments to public nudity and past sexual harassment allegations involving a deceased firefighter. However, Mitchell emphasized that much of this information remains speculative, and only Murphy shared a firsthand account with her.

While Mitchell has not had any incidents with Hudgins in 2024, she goes out of her way to avoid him, stating she is "tired of being put in situations where [she is] uncomfortable." She also expressed a reluctance to report on her experience with Human Resources due to a perceived lack of confidentiality and fear that filing a complaint could cost her the Academy placement.

**Marian Farris[4]**

---

[4] During the investigation, the investigators learned that Marian Farris resigned from employment.

Marian Farris, employed by the City of Philadelphia since 2006 and with the Philadelphia Fire Department since 2016, served as the Payroll Investigations Supervisor and supervised a team of 11 employees. She has known Hudgins since 2016, as they worked on the same floor. Farris disclosed that while she often disregarded uncomfortable comments from Hudgins, she submitted a formal complaint to the City Law Department around September 2024 after Hudgins made repeated remarks about her weight loss and suggested that she looked sick. After Farris filed her complaint, her cubicle was relocated further from Hudgins' office, and although Hudgins became more apologetic, their interactions remained strained. Farris recalled that when she served as an Administrative Technician, Hudgins frequently visited her cubicle for no reason and often lingered in silence. She perceived his presence as a “power move.” Farris recounted an incident in 2020 where Hudgins unbuckled and unzipped his pants to fix and tuck his shirt in her cubicle.

Farris described the unwanted physical contact with Hudgins over the years. She estimated receiving approximately 25 hugs over her eight-year tenure and emphasized that they were a little longer than a normal hug. Additionally, Hudgins has commented on her appearance and touched her hair, behavior that Farris chose not to report at the time due to his high-ranking position. She also noted an incident where she was directed to record work hours for Corinna Cosenza despite her absence from the office, in violation of City policy on remote work.

Farris expressed concern over Hudgins’ micromanagement of Chief Randolph, believing Hudgins set Randolph up to fail. She also linked Hudgins’ sudden scrutiny of payroll data, specifically targeting paramedic Jacqulyn Murphy’s overtime, to prior disputes about timekeeping irregularities, including time for Cosenza. Initially, Hudgins requested only Murphy’s data but later expanded his request to include about ten other employees, all from Murphy’s unit, without comparing data from field employees. Farris questioned his continued requests, which she complied with, at the HR Director’s direction, though she doubted a formal investigation ever materialized. Despite being instructed to keep the investigation confidential, Hudgins eventually confronted Murphy directly about it.

Farris concluded by sharing that she has heard numerous rumors surrounding Hudgins’ behavior, including that many employees feel uncomfortable with his physical contact. She observed that Hudgins’ conduct worsened following his promotion to CAR 2, as he appeared to believe he had more unchecked authority.

**Kelly McCrory**

Kelly McCrory, a paramedic with the Philadelphia Fire Department for over twelve years, has been stationed at Engine 7, Medic 2 near Kensington Avenue and Castor Avenue for the past six years. She first encountered Chief Hudgins in 2018 during a disciplinary investigation in which she was the subject. McCrory had been accused of signing off on a patient chart on someone else’s behalf, and then-Chief Hudgins, assigned to the Special Investigations Office, was responsible for conducting the investigation, compiling a report, and determining disciplinary action. When McCrory and union representative Ray Vozzelli arrived at Hudgins’ office for the investigatory interview, she described being met with a “long, creepy hug” from Hudgins, which struck her as highly inappropriate and unprofessional given the disciplinary nature of their meeting. Feeling unsure about how her response might impact the outcome of the investigation, McCrory did not

reject the hug but found the gesture unsettling and overly familiar. She later received a 24-hour suspension from Hudgins.

Prior to this incident, McCrory only had brief encounters with Hudgins, although he occasionally made her uncomfortable by asking personal questions about her brother-in-law's health, although Hudgins and her brother-in-law were friends. After the disciplinary event, McCrory announced her pregnancy and was temporarily reassigned to FAB in 2018, where she had more frequent interactions with Hudgins. During her time at FAB, McCrory reported that while at the FAB in 2018 Hudgins would stand over her desk and attempt to engage her in conversation. He also made inappropriate and sexually suggestive remarks in front of groups of employees, including sharing that he shaved his wife's pubic hair. McCrory found Hudgins' comments disturbing and unprofessional. Although deeply uncomfortable with these interactions, McCrory chose to disregard them due to Hudgins' high rank and perceived authority within the department.

**Hilda Bradshaw**

Hilda Bradshaw, a Fire Service Paramedic with over 23 years of experience, is assigned to Engine 45, D-Platoon although she is out injured. She explained that following a work-related injury in 2021, she was placed on limited duty intermittently from 2022 through 2024. During one of these assignments at the FAB, she encountered conflict with Hudgins. Bradshaw expressed a preference to avoid future limited duty assignments, specifically to avoid working downtown where Hudgins is based. She noted that upon returning to work on or around September 23, 2022, she was unaware that command structure had changed, and that Hudgins now oversaw light duty assignments. Operating under the assumption that prior work-from-home practices remained in effect, she initially did not report in person.

By early October, Bradshaw learned from her colleagues, Tammy Singleton, and Captain Jay Singleton, about rumors that Hudgins was actively looking for her and that she was at risk of termination. She contacted Garrett Dietz, who denied any such termination discussions but confirmed that Hudgins had been trying to reach her. Bradshaw, however, stated she had not received any communication from Hudgins or his aides. She subsequently attempted to correct any attendance issues by backdating her leave.

Bradshaw described a meeting with Hudgins in which he warned her not to disclose something he had done for her, though she was unclear what he meant. Hudgins also instructed her to go through him for holiday leave requests, in contrast with her understanding that such requests should be routed through her company officer. She reported that Hudgins enforced an 8:00 a.m. check-in policy at the FAB and maintained an attendance sheet but did not consistently apply the rule to all personnel. She perceived that staff members closer to Hudgins were exempt from the policy. Bradshaw filed an internal complaint with the union and with Dietz, but she stated no action was taken. She emphasized the personal impact of the enforced schedule, particularly regarding the care of her son with special needs, who was eventually homeschooled as a result of her shift change.

Bradshaw further noted that Hudgins' office rules frequently changed and were not communicated directly. Instead, aides Corrina Cosenza and an individual named Natasha distributed written

policy updates that required employee signatures to confirm receipt. Bradshaw also raised concerns regarding the handling of her medical restrictions. Despite documentation from the City's physician limiting her walking distance due to knee issues, she stated that Hudgins often ignored those accommodations and asserted control over her duty status, implying that financial consequences would follow noncompliance. Bradshaw alleged that Hudgins contacted her physician, Dr. Rudnick, to override restrictions against medical advice and return her to full duty. Although the doctor eventually cleared her for full duty in August 2024, Bradshaw opted to use leave time, relying on guidance from her personal physician who did not approve her return.

Bradshaw expressed a general mistrust of the Department's Human Resources Division, citing a broader lack of institutional support during her conflicts with Hudgins. She also referenced a prior, unrelated sexual harassment complaint against a department physician that contributed to her sense of distrust. Bradshaw reiterated that, even if cleared for limited duty, she would not return to the FAB, describing it as a "toxic" environment due solely to Hudgins' presence. She stated that absent his influence, she would have no issue resuming limited duty.

**Deputy Commissioner Anthony Hudgins**

Deputy Chief Anthony Hudgins has served in the Philadelphia Fire Department for over three decades, beginning his career as a Firefighter in 1994 and progressing through various ranks to his current role as First Deputy Commissioner, a position he assumed in approximately December 2021. Throughout his tenure, Hudgins typically remained in each rank for three to six years, holding multiple titles within those ranks. He also previously served on the Board of IAFF Local 22. Upon his initial appointment to Deputy Commissioner, Hudgins held the CAR 3 designation and became First Deputy Commissioner during the summer of 2024. In his capacity as CAR 3, Hudgins oversaw several units and departments, including Finance, the Fire Communication Center, the Health and Safety Office, Recruitment, the Fire Academy, and the Technical Service Unit. As CAR 2 (First Deputy Commissioner), his responsibilities expanded to oversight of all units, including EMS personnel, with a particular focus on field operations. Hudgins described the Department's structure as historically split between the "Fire side" and "EMS side," but explained that the Department's current philosophy is to merge the two. All other Deputy Commissioners report directly to the First Deputy Commissioner. Hudgins noted that his primary daily contacts are with HR Director Princess-Cincerae Ray and Marguerite Morgan, the Fiscal Officer. He has worked at the FAB intermittently throughout his career and estimated spending a total of approximately 14 years stationed there, including his longest FAB assignment in the Fire Prevention Unit. Prior to his promotion to Deputy Commissioner, Hudgins held the rank of Deputy Chief and, from 2015 to 2018, served as the Special Investigations Officer, a role based at the FAB. Between 2018 and his appointment as Deputy Commissioner, Hudgins was assigned to field operations at Division 1, located at 3100 Grays Ferry Avenue, and he did not return to the FAB until his promotion. Hudgins estimated that the Fire Department employs between 2,700 and 2,800 personnel and consists of 13 battalions. He stated that department-wide harassment training sessions have been held approximately every two years during his career but confirmed that he has not received individualized harassment training. He also expressed personal sentiments, stating that he loves his wife very much and that they have been married for 30 years.

Regarding Nuriyah Jordan, Hudgins explained that when he served as the Special Investigations Officer, his office was located roughly 150 steps from Jordan's cubicle. Upon returning to the FAB as Deputy Commissioner, Hudgins gained supervisory responsibilities over the Human Resources (HR) Department, under which Jordan works. Marian Farris reported to Hudgins, and Jordan reported to Farris. During Hudgins' previous assignment to Division 1, any interactions he had with Jordan would have occurred by phone. Hudgins categorically denied the alleged late summer or early fall 2022 incident in which he purportedly made a comment about his "best assets" and allegedly grabbed his crotch area while at work, stating the event "never happened." He also stated he does not recall the August 2022 incident in which he was alleged to have partially dropped his pants in front of Jordan while changing for a meeting. He emphasized that he does not change his shirt in front of anyone and would not summon anyone to his office if he needed to change. Concerning the August 6, 2022 allegation that Hudgins closed Jordan's cardigan and made a remark that he was "still a man," Hudgins could not recall the specific interaction or what Jordan was wearing but asserted that he did not physically touch her or make that statement. He recalled only making a passing comment to Jordan in the hallway, such as "it's cold outside." Hudgins vaguely remembered the exchange primarily because then-Commissioner Craig Murphy later informed him that Jordan had reported feeling uncomfortable. Murphy asked Hudgins if anything had occurred, and Hudgins responded that the only interaction involved his weather-related comment. Hudgins stated that he does not believe the event took place in August, as he distinctly remembers cold weather at the time. Following the conversation with then-Commissioner Murphy, Hudgins apologized to Jordan for potentially making her uncomfortable, to which Jordan reportedly responded, "Okay, it's good." After this, Hudgins communicated to all personnel that his door was always open.

Hudgins also stated that upon taking on the CAR 3 role and familiarizing himself with departmental operations, he observed unusually high overtime hours logged by Jordan and Farris, up to 20 hours per day across several days, while subordinate staff logged significantly fewer hours. He began tracking these overtime patterns and raised his concerns with the HR Director, who then addressed the issue with Jordan and Farris and initiated her own tracking. According to Hudgins, after their overtime was questioned, Jordan and Farris "led a rebellion," reporting to the building but refusing to work for a day, allegedly because they wanted to work overtime. Hudgins stated that his objective was not to eliminate overtime opportunities but to ensure fair distribution among all staff. He added that Ray eventually took over the approval process for all overtime, a protocol she initiated and which she reported to Hudgins.

Hudgins also denied ever "blowing a kiss" at Jordan or any other employee and denied making statements about loving his wife in a way that implied impropriety or suggesting he would retire if Jordan's allegations were disclosed. Beyond the hallway comment that then-Commissioner Murphy informed him of, an incident for which he apologized, Hudgins stated that he was unaware of any other complaints from Jordan. He explained that when engaging with employees, including Jordan, he typically knocks on the outside of their cubicle and only enters if invited, a practice he follows with all staff on her floor.

Hudgins denied ever making any comments regarding Dana Jackson's breasts. Hudgins explained that he directed Jackson not to contact the Managing Director's Office directly after receiving such instructions from Fire Commissioner Jeffrey Thompson. Hudgins stated that Thompson conveyed

the directive on behalf of the Managing Director. Acting on that directive, Hudgins went to Jackson's office, where she invited him in, and he informed her that she needed to follow the chain of command when communicating with City leadership. Jackson requested that Hudgins formalize the request in writing. As a result, Hudgins returned to his office and sent Jackson an email reiterating the same information he had communicated in person. Hudgins emphasized that he was merely relaying a message that originated "directly from the Managing Director himself through the Commissioner."

Regarding Dana Jackson's access to the LaborSoft system, Hudgins stated that Jackson was denied access because he had been informed that only one or two individuals should be granted access to the platform. LaborSoft contains sensitive information related to Equal Employment Opportunity (EEO) complaints submitted to the Department, and limiting access was intended to preserve confidentiality.

Hudgins recalled having a conversation with Amanda Mitchell regarding her Duties as Assigned (DAA) status but insisted that the discussion did not involve breastfeeding. He explained that he had contacted Mitchell's Deputy Chief, Mike Richie, to inform him that Mitchell could no longer be assigned to DAA because she had already had her child. Richie, however, submitted a memo requesting that Mitchell remain at the Academy due to her impressive performance, and Hudgins approved this request. While at the Academy for an unrelated matter, Hudgins spoke directly with Mitchell and informed her of the change in her assignment status, noting that he would follow up with her in 90 days in accordance with Department policy. Hudgins denied making any threatening remarks during this interaction and stated that this was his first time meeting Mitchell. He acknowledged that he may have asked Mitchell who had assigned her to the Academy but denied using profane language toward Bowmer or threatening to have Mitchell transferred. Later, Hudgins spoke with Mitchell's husband, Captain Chris Mitchell, over the phone. He described the conversation as non-confrontational and noted that Captain Mitchell never told him to "stay away" from Amanda Mitchell. Hudgins also denied ever hugging Amanda Mitchell. He further stated that he could not recall disciplining Kelly Boylan (also known as McCory) or hugging her if such a disciplinary meeting had occurred.

Regarding Mary Preston, Hudgins recalled a conversation with her in his car but could not remember whether he initiated the meeting or if Preston requested it. Preston was under scrutiny as part of the overtime investigation for creating an electronic signature for Deputy Commissioner McCall and using it to approve her own overtime. Hudgins mentioned that he told Preston that Jacqulyn Murphy appeared upset with him because Murphy had stopped speaking to him, but he added that he did not care, as he was focused on doing his job. Hudgins denied making any comment about Dana Jackson's breasts to Preston and also denied stating that the warehouse did not hire Black people. However, he confirmed telling Preston that he would not approve the new drone program unless the participants were diverse, noting that only white men were part of the program at that time.

Hudgins further stated that Jacqulyn Murphy had been contacting employees in the Department to ask them to join the complaint or if they had information to support a complaint against him. Hudgins said that Murphy told his aide, Corrina Cosenza, that she intended to "get [him] out of here." He understood this to mean that Murphy was wanted to get him fired. He confirmed that he

was last in the office on December 6, 2024, before leaving for vacation and that upon his return, Commissioner Jeffrey Thompson directed him not to come back to work due to the ongoing harassment investigation. Hudgins also mentioned that approximately a year prior, Murphy and Boyle had invited him to their home for a housewarming event, which he declined. He described his supervisory style as "open" and "transparent," emphasizing that he is "driven by policy, rules, and regulations," and that he strives to promote equity by treating others the way he would want to be treated.

Hudgins acknowledged making a comment to Farris about her weight loss, stating he told Farris, "You're looking thinner," to which Farris responded, "Oh, thank you." Hudgins recalled that the comment occurred in the HR Director's office and noted that the Director made a similar remark. Hudgins confirmed that the Fire Commissioner had not addressed this interaction with him. Hudgins also stated that he has touched Farris' hair on approximately two or three occasions but emphasized that this occurred at Farris' own invitation. According to Hudgins, Farris frequently changes the color of her hair and, during these occasions, would say "look at my hair" while flipping it toward him. He stated that these interactions occurred in public settings, and Farris has never told him not to touch her hair. Hudgins denied ever pulling Farris' ponytail or making any comments about doing so. He also denied unbuttoning his pants to tuck in his shirt in front of Farris or anyone else.

Hudgins stated that he greets all personnel, both men and women, by hugging, although he clarified that this practice is more common among uniformed staff. He specifically emphasized that he has never hugged Marian Farris or Nuriyah Jordan. Addressing the structural differences in scheduling, Hudgins explained that fire and paramedic personnel assigned to field work generally operate on 12-hour shifts, four days on and four days off, whereas staff personnel work eight-hour shifts on a standard Monday through Friday schedule. As a result, Hudgins noted that field personnel have more opportunities to work overtime due to their off-day availability and the Department's ongoing staffing shortages in field positions.

In or around September 2024, Hudgins became aware that Jacqulyn Murphy had earned more income in a single quarter than any other employee in the Department, a fact supported by publicly available data. On October 9, 2024, Battalion Chief Ted Quendenfeld texted Hudgins a link to a public government database at data.philly.gov. When Hudgins reviewed the site, he confirmed that Murphy, a paramedic assigned to a staff position, was listed as the Department's top earner, surpassing field paramedics and even captains. Hudgins described this as highly unusual and "kind of impossible" for a staff paramedic. He estimated that Murphy had matched her annual base salary through overtime in just one quarter. Despite working in the office both early in the morning and late into the evening, Hudgins stated that he rarely saw Murphy present during those times.

Hudgins also discovered that Murphy received overtime compensation during a period when she was out on leave under Act 17, which should not have occurred. He contacted the City's payroll system, One Philly, to inquire how this could have happened. A representative from One Philly informed him that the system had been manually overridden to allow the overtime payment. Hudgins reviewed the Department's internal overtime records and found instances where overtime had been awarded without any supporting documentation, no forms or justifications explaining the work performed. He emphasized that overtime must be accompanied by proper documentation.

Hudgins confirmed that Murphy does not have the capability to process or approve her own overtime and acknowledged that other staff employees had also received substantial amounts of overtime, although Murphy's totals were the most excessive.

Hudgins identified additional anomalies, including instances where Murphy was paid as if she had worked an 18-hour shift and a separate occurrence where she received six hours of overtime for charging radio batteries. Upon further review of payroll records, Hudgins discovered that Farris was the individual who had overridden the system to input overtime for several staff employees with excessive overtime. At one point, when Hudgins asked Farris who was responsible for managing overtime of FAB staff, Farris initially claimed she did not know. She later admitted that she herself handled the FAB overtime. Following this disclosure, Hudgins began requesting information from the HR Director and another HR employee, Garrett Dietz, as he no longer considered Farris to be a trustworthy source and suspected she may have been involved in inappropriate conduct regarding overtime approvals.

Before taking scheduled vacation leave in December 2024, Hudgins submitted his findings to the City's Office of the Inspector General, which assumed control over the investigation. While on leave, Hudgins received phone calls from employees reporting that Jacqulyn Murphy had been circulating statements throughout the Department claiming she intended to "get rid of" Hudgins. Around the same time, the Department received a letter from the Internal Revenue Service (IRS) indicating that Murphy had not been paying her taxes properly. Hudgins believed the IRS had contacted the City because Murphy had failed to respond to the agency's earlier attempts to reach her directly. That letter was forwarded to both the Inspector General's Office and to Murphy. In November 2024, prior to his vacation, Hudgins informed Murphy that he was conducting an overtime investigation. He explained that this conversation was intended to address rumors that had begun circulating at the FAB regarding the ongoing inquiry. Hudgins did not conduct interviews as part of his review, stating that his intention was simply to gather relevant information and then refer the matter to the Inspector General for further handling.

Deputy Commissioner Anthony Hudgins confirmed that he has known Tabitha Boyle for over a decade and acknowledged that the two greet each other with hugs "probably every time" they see one another. Hudgins described the hugs as brief, lasting approximately half a second, and explained that hugging is a common workplace greeting within the Department, including among uniformed and civilian employees as well as leadership, such as the Commissioner. Hudgins stated that he does not always initiate the hugs, and they are sometimes mutual or initiated by the other party. He denied ever insisting or pressuring Boyle for a "real hug," clarifying that if such a comment was made, it would have been to his aide, Corrina Cosenza, with whom he has a close working relationship.

Hudgins recalled that he may have touched Boyle's hair once during a conversation she initiated about wearing her hair longer to appear more sympathetic in court. He stated that Boyle may have even grabbed his hand and placed it on her hair during the exchange. He denied ever discussing his wife's pubic hair, anyone else's pubic hair, or making sexual comments of that nature in the workplace.

Hudgins denied requesting a memorandum from Boyle while she was on vacation for her wedding, but he acknowledged that any such request could have originated from administrative procedures, not from him directly. He explained that memos are commonly required for conferences or additional holiday leave and would typically be routed through the chain of command. Hudgins added that he was unaware Boyle and Murphy were getting married until after the fact.

Regarding the denial of Boyle's request for a leave of absence to return to school, Hudgins stated that he did not make the decision but delivered the message on behalf of Commissioner Thompson and the HR Director. Boyle's request was denied on the basis that the degree she sought, a psychology-related program, was not in furtherance of her current position as a firefighter, as required by the Civil Service Regulations.

Hudgins acknowledged that the film "Chuck and Larry" was mentioned once in a group setting after Boyle and Murphy's marriage, but he denied ever commenting himself. He stated that Murphy laughed when the reference was made and emphasized that he only congratulated the couple. Hudgins further noted that he never received a complaint about Chuck and Larry jokes and that, as a matter of practice, he instructs employees to submit any concerns in writing to be directed to the SIO office.

Hudgins also denied ever being approached by Boyle with a request to stop harassing Murphy. He denied making inappropriate sexual comments or suggestions regarding Murphy and Boyle, including proposing a threesome, wanting to take them on vacation, or expressing sexual interest in them. Hudgins noted that he has shown many employees photographs of a property he hopes to purchase in Costa Rica but denied ever tying that to inappropriate commentary. He also denied making remarks about how Black men are treated in Costa Rica.

Hudgins acknowledged hugging Murphy in the same way he hugs Boyle, describing the gesture as a friendly greeting he extends to "all of [his] friends." He denied commenting on Murphy's appearance in Facebook photos and clarified that he does not use Facebook. Hudgins also denied making or directing decisions about Murphy's unit reporting in-person, explaining that this directive came from Mayor Cherelle Parker and applied to all units. He reiterated that uniformed employees are essential personnel and were never authorized to work remotely.

Addressing questions about his aides' visibility in the office, Hudgins explained that they accompany him to various work sites, such as City Hall, which may account for their absence from the FAB office. He noted that Marian Farris improperly deducted time from aide Corrina Cosenza's records based on not seeing her in the office, an action Hudgins said exceeded Farris' authority without supporting documentation.

Hudgins denied staring at employees or lingering inappropriately. He described his routine practice of walking the office to check operations, during which he may knock on cubicle walls and converse with staff, always after being invited in. He could not recall ever entering a cubicle and sitting silently.

Finally, Hudgins expressed his belief that the harassment complaints lodged against him are retaliatory, stemming from his ongoing investigation into excessive overtime. He clarified that his

aide, Natasha Robinson, never submitted a complaint against Kendrick Long, despite rumors suggesting otherwise.

**Marguerite Morgan**

Margurite Morgan has been a city employee for twenty-five years and has worked at the Department for the last five to six years as the fiscal officer. She works out of the administration building where she works closely with Hudgins. Morgan has never observed Hudgins act inappropriately in the workplace; however, she heard from Murphy that Hudgins was harassing a group of women, that they submitted a complaint, and they wanted Hudgins out of the Department. Morgan did not learn from Murphy any details about the complaint or allegations against Hudgins. Morgan could not recall when Murphy told her about the investigation; however, Morgan was sure that she told Hudgins about the conversation immediately after talking to Murphy.

Morgan, as the fiscal officer, trained Hudgins on some of the payroll and finance systems after he was promoted to Deputy Commissioner. She noted that Hudgins was in the process of helping her enforce the Department's procurement policies and procedures. Morgan noted that she and Hudgins found issues with the practice in the Department to purchase goods without the required purchase order, and the increasing overtime budget. She encouraged Hudgins to continue his overtime investigation to determine why the overtime budget has not decreased. Morgan recalled knowing about the overtime investigation, but she did not know if the investigation focused on specific employees.

**Corrina Cosenza**

Corrina Cosenza has worked for the Department since 2011 and currently serves as a Fire Service Paramedic and aide to Hudgins. After sustaining a back injury toward the end of 2019, she was on light active duty upon returning to work in 2022, which involved being assigned to headquarters with limited active responsibilities. During this period, she volunteered to assist Deputy Chief Ewing with drafting directives and operational documents. When Hudgins' former aide, Jeffrey Stowe, returned to a field assignment in late 2022, Cosenza temporarily filled in as Hudgins' driver. Subsequently, Hudgins offered her the permanent aide position, which she officially assumed on March 17, 2023, while Hudgins was Deputy Commissioner of Logistics (CAR 3). Hudgins was later promoted to Deputy Commissioner of Operations (CAR 2) in summer 2024. Cosenza described the aide role as similar to an executive secretary, assisting Hudgins with a range of duties including notetaking, driving, drafting documents, and supporting meetings.

Cosenza had limited prior experience with Hudgins, noting a professional interaction in 2016 during a disciplinary matter. Since becoming his aide, she described Hudgins as welcoming and respectful, particularly toward women, and stated that he respects his wife. She characterized his workplace interactions with women as professional. While Hudgins has hugged her, Cosenza did not find these interactions uncomfortable or forced and believes she could decline such gestures without issue. She noted that hugging among command staff depends on the individuals involved and acknowledged that such familiarity is common given long-term working relationships. Cosenza observed Hudgins adjusting his uniform but did not find any behavior inappropriate or

warranting privacy. She firmly denied ever hearing Hudgins make comments about women's physical appearance or breasts.

Cosenza spends most of her workday with Hudgins, sitting near or in his office, attending nearly all his meetings, and driving him as needed. She reported no discomfort in their interactions. She suggested that allegations of misconduct against Hudgins emerged only when individuals faced potential disciplinary action. During Hudgins' tenure as CAR 3, he oversaw a review of overtime distribution within the Department due to concerns about excess overtime. Cosenza, along with Natasha Robinson, investigated overtime usage, discovering uneven distribution, with a small group of warehouse employees logging the majority of overtime for menial tasks, sometimes performed by higher-ranking personnel without necessity. This was described as akin to nepotism. Cosenza also highlighted irregularities involving Jacqulyn Murphy's overtime entries, including missing or retroactively entered SharePoint forms, improbable overtime hours given her regular shift and childcare responsibilities, and overtime claims made shortly after sick leave, contrary to Department policy. Additionally, Murphy's leave days were not properly deducted from her records. Around the same time, the Department received an IRS notice regarding Murphy's federal tax withholding status, which Human Resources shared with leadership.

Following these discoveries, Hudgins convened a meeting with other Deputy Commissioners to discuss the ongoing overtime investigation, which included Bowmer and McCall. Cosenza noted that Mary Preston, who works under McCall and is Murphy's close friend, was present. After this meeting, Cosenza stated that "everything started to take a turn." On November 1, 2024, Cosenza encountered Murphy visibly upset outside and Murphy's wife, Boyle, was comforting Murphy. Cosenza said that Boyle told Cosenza "you better fucking find somewhere to go. You better get another assignment because Hudgins is going down and you're going the fuck down with him." that Hudgins was "going down" Cosenza did not know why Murphy was distraught but thought that the only reasonable explanation was that Murphy learned about the overtime investigation. Cosenza also mentioned that Christina Quinones, Deputy Commissioner Randolph's aide, had been contacting women within the Department to ask if they had any negative experiences with Hudgins.

Regarding Amanda Mitchell, Cosenza stated that Hudgins provided special consideration for her following Mitchell's pregnancy by creating a headquarters position rather than returning her to the field. Cosenza noted that Mitchell was never alone with Hudgins; she accompanied and drove Hudgins to meetings with Mitchell and Deputy Chief Richie at the Academy and left immediately afterward. Cosenza emphasized that Hudgins is always accompanied by either her or another aide, Natasha Robinson, who joined in summer 2023, and that Hudgins does not travel unaccompanied. She also recalled a separate instance when Hudgins toured the Academy with a councilperson for grant purposes, during which she attended CPR training.

Cosenza further explained that Hudgins has advocated for the installation of pumping stations within the Department, collaborating with City attorneys and planning appropriate placements, although the stations have not yet been implemented.' Cosenza emphasized that no complaints against Hudgins arose until immediately after a deputy commissioner meeting where Hudgins raised concerns about payroll inconsistencies and excessive overtime. She noted that the workplace atmosphere changed significantly following that meeting. Since the start of the overtime

investigation, Cosenza has experienced hostility and intimidation from Jacqulyn Murphy, Chief Boyle, and others, which she believes is due to her prominent role in the investigative research. Cosenza also observed that Marian Farris took two weeks of vacation time without approval.

Cosenza reported that Christina Quinones had contacted several women in the department to organize them for the ongoing investigation but had not reached out to her directly. She became aware of these efforts through her child's father, Chief Anthony Bompadre. Regarding the payroll and overtime investigation, Cosenza highlighted numerous instances where Murphy logged overtime hours without corresponding SharePoint forms, including overtime on days Murphy was reportedly sick. She explained that HR personnel including Marian Farris were responsible for managing payroll inputs and leave deductions but were not properly deducting leave for Murphy. On the day the investigation files were sent to Central Finance in early 2025, Farris submitted paperwork for Murphy's FMLA leave.

Cosenza firmly stated that if Hudgins had behaved inappropriately towards her or anyone else, that Cosenza would not act as if everything was normal. She noted that she had overheard Murphy making vulgar and sexual remarks in the workplace. On August 1, 2024, Murphy sent Cosenza pictures of her son with laughing emojis, requesting that Cosenza show them to Hudgins.

Cosenza has never filed a complaint against Kendrick Long, although she felt he gave her the cold shoulder in Fall 2024 and simply commented on it to colleagues. She has never heard Hudgins mention anything about a threesome or any department members being referred to as "Chuck and Larry." Lastly, Cosenza stated that Tabitha Boyle informed her that Boyle and Murphy were planning to marry so that Boyle could maintain department benefits after returning to school and retiring. She also noted that Boyle remained friendly with Hudgins despite his denial of her leave of absence request.

**Michael Richey**

Richey is currently employed by the Department as the Fire Academy and has been working as the Deputy Chief as the Safety Officer since 2019. Richey confirmed that he knows Amanda Mitchell, having worked with her closely for four to five years, but expressed surprise at her allegation against Hudgins and stated that he has no knowledge of any incident between them. He emphasized that Mitchell never reported any inappropriate behavior or concerns regarding Hudgins to him.

Richey went on to explain Mitchell's professional background, noting that she initially spent about six months around the Fire Academy before he brought her into the Safety Office in 2019. He described her as instrumental in developing a PPE (Personal Protective Equipment) database, managing gear inventory using Excel, and assisting with planning and budgeting. Richey praised her aptitude, stating that she became highly skilled and a crucial asset to the office. He even noted that he would have strongly opposed any attempt to reassign her due to her value to the team.

Richey recalled a vague memory of Chief Hudgins possibly speaking to Mitchell in 2020 or 2021 but could not confirm specific details. At that time, Mitchell was detailed to the Safety Office from Engine 61 as part of a special PPE management program that Richey had initiated. Given the office's limited staffing, Richey secured formal approval through memos to the Fire Commissioner

for Mitchell's 90-day detail, which was repeatedly extended due to her critical role. Mitchell was instrumental in maintaining a large and constantly evolving database tracking over 12,000 pieces of gear, and Richey considered her performance indispensable.

Field chiefs, facing pressure from City Hall to reduce overtime, often pushed back on personnel assignments at the Academy. Richey believes this environment may have led Hudgins to directly question Mitchell about why she was still assigned to the Academy. Richey emphasized that he was not present during the Hudgins' conversation with Mitchell and that Mitchell did not report it as offensive or inappropriate at the time. However, he later acknowledged that he could understand why or if Mitchell was uncomfortable if Hudgins, given his rank, bypassed the chain of command and confronted Mitchell directly and alone. Richey agreed that such a situation would have been upsetting for any firefighter being questioned by a Deputy Commissioner without a supervisor present. He said that if Hudgins had questioned Mitchell in that manner, it would not have been appropriate, and he would have intervened if he had been there. Richey did not know the tone Hudgins used when speaking to Mitchell. Nevertheless, Richey spoke with Hudgins and advocated for Mitchell to stay in her role at the Academy. Mitchell remained assigned to the program. He also mentioned that once Hudgins understood Mitchell's role and contributions, no further action was taken to remove her from the Safety Office.

Again, Richey clarified that he did not witness Hudgins speak to Amanda Mitchell directly but heard about the interaction secondhand from a captain and a battalion chief. He explained that Hudgins was known to be a hands-on leader who likely visited the Fire Academy to verify field complaints about personnel possibly just sitting around there.

Richey said he had no firsthand knowledge of any inappropriate behavior by Hudgins toward women and had never heard any complaints involving Hudgins prior to this. He initially thought any complaint against Hudgins was financial in nature, not related to conduct. Richey acknowledged that Hudgins should have contacted him directly about Mitchell's assignment rather than approaching her, as that would have been the appropriate chain of command. He speculated that Hudgins probably questioned multiple individuals that day, not just Mitchell, and reiterated that the Fire Department is large and often temporarily accommodates employees for various reasons, including personal or medical issues. Ultimately, Richey saw Mitchell's presence at the Academy as justified and her assignment within his authority.

**Derek Bowmer**

Derek Bowmer, currently a Battalion Chief and former Executive Chief and Deputy Commissioner, has worked closely with Hudgins for about 22 years, both professionally and personally. Since 2019, Bowmer has held various executive roles, including Assistant Deputy Commissioner in 2021, and now reports directly to the Commissioner, independent of the CAR assignments. Bowmer has never witnessed Hudgins make inappropriate comments toward women and described Hudgins as friendly but professional, keeping his private and professional lives separate.

Bowmer is acquainted with Jacqulyn Murphy and Tabitha Boyle and noted hearing "Chuck and Larry" comments about their marriage, though not from Hudgins, and described the remarks as

lighthearted without offense. He recalled that Hudgins raised concerns about Murphy's excessive overtime in early 2024, prompting an investigation into payroll irregularities. Bowmer noted that Tabitha Boyle's request for a leave of absence was denied but she was accommodated with a modified schedule. He indicated that prior to the overtime investigation, workplace relationships were amicable but became tense afterward.

Regarding workplace conduct, Bowmer observed that hugs between employees, including Hudgins, were common and consensual, often reflecting existing relationships rather than any form of coercion. He stated that Hudgins would be the first to apologize if inappropriate behavior occurred, though Bowmer himself has never seen or heard of such conduct. While some female employees reportedly felt uncomfortable with Hudgins' stare, Bowmer attributed this to Hudgins being in "thinking mode" rather than any sexual intent. Bowmer denied any romantic or sexual relationship with Murphy and noted that he stepped down from an executive position, believing it was related to a complaint Murphy filed.

Bowmer confirmed that Murphy's overtime hours were excessive and, in some cases, not feasible given her schedule. He explained that under pandemic-related policies, employees could call out sick without using leave, but Murphy allegedly received overtime during such periods, which violates policy. He also noted that Murphy had over fifty hours of unapproved overtime, with payroll staff responsible for inputting hours, indicating potential payroll irregularities. Bowmer acknowledged signing off on overtime for special events that Murphy did attend.

Overall, Bowmer emphasized that he has never witnessed any inappropriate behavior by Hudgins and described their relationship as one where both feel comfortable correcting each other's conduct when necessary. He believes the complaints against Hudgins are retaliatory, linked to the ongoing overtime investigation.

**Craig Murphy**

Commissioner Murphy recalled that in 2019, Nuriyah Dawkins informed him she felt uncomfortable around Hudgins, particularly when alone in his office. At that time, Murphy was assigned to CAR 2 and Hudgins to CAR 3. Dawkins asked Murphy to speak with Hudgins, which Murphy did, issuing a warning to Hudgins. Dawkins declined to pursue a formal complaint but indicated she would report back if the issue persisted. Murphy could not recall specific details of Dawkins' concerns. He stated he received no other complaints regarding Hudgins and has never personally witnessed inappropriate behavior by Hudgins toward women. As Hudgins' supervisor, Murphy emphasized he would have intervened if any misconduct had been observed.

**Christina Quinones**

Christina Quinones has worked for the Department for over nine years and currently serves as an aide to Deputy Commissioner Carl Randolph, who is assigned as CAR 3. Quinones began her role as Deputy Commissioner Randolph's aide in April 2024, after previously being stationed at the Fire Academy since July 2024. During her pregnancy, Quinones was assigned to the Fire Training Academy, where she assisted Chief Randolph with a project. Following childbirth, Randolph requested that Quinones continue providing clerical assistance at the Academy; however, she was

subsequently reassigned to the field. When Randolph was promoted to an executive officer position that entitled him to have an aide, Quinones accepted the assignment.

Her duties as Deputy Commissioner Randolph's aide include assisting with various tasks such as driving, managing light-active-duty members, and supporting additional projects as assigned. Quinones is married to Jose Quinones, who also works within the Department.

Quinones recalled that when Hudgins was CAR 3 and Randolph had recently been appointed CAR 4, Hudgins called her husband into his office and inquired about Quinones' childcare arrangements and work schedule. Quinones considered this line of questioning inappropriate. However, Jose Quinones reported the matter to Chief Randolph, who addressed the situation directly with Hudgins.

Although Quinones described Hudgins as "nice enough," she stated that she perceives some of his behavior as "weird or odd" and has made efforts to maintain distance from him. She recalled an incident in which Hudgins left his office to sit silently at her desk to "decompress." To reach her desk, Hudgins had to pass by the desks of his own aides. Quinones interpreted this as a possible "mind game" or form of intimidation. She reported the incident to her supervisor but felt it did not warrant further action unless it recurred. She described the situation as "professionally weird," but not sexual in nature.

Quinones also recalled an occasion when Hudgins may have attempted to hug her once. She stated that she made her discomfort with physical contact clear through her body language and facial expressions. While Quinones personally interpreted Hudgins' requests for hugs as "friendly gestures," she acknowledged that other female employees, particularly those who do not work near Hudgins or lack an existing relationship with him, may perceive such contact as inappropriate or "odd."

Quinones shared that she has heard from other female employees about uncomfortable experiences with Hudgins, including an incident where Hudgins allegedly pulled a female employee's hair. Another employee reportedly felt uncomfortable after Hudgins repeatedly entered her workspace and allegedly threatened to reassign her, in addition to making inappropriate comments about her breasts while she was breastfeeding. That employee's husband, who also works for the Department, addressed the issue directly with Hudgins, requesting that he cease contact with his wife. Despite this request, Hudgins later gave the female employee a hug. Quinones noted that this occurred before she was assigned as Deputy Commissioner Randolph's aide. (The employee referenced is likely Amanda Mitchell.)

Quinones stated that she has never directly heard Hudgins make inappropriate comments about women's bodies in the workplace but is aware of rumors and stories regarding such behavior. Additionally, Quinones owns "smart glasses" capable of recording audio and video. She stated that the idea of these glasses made Hudgins "very uncomfortable." Hudgins informed her that formal rules or directives banning the use of smart glasses in the workplace would be forthcoming. Quinones said she would continue to wear the glasses until such a directive is formally issued.

Quinones indicated that she has spoken vaguely with Jacqulyn Murphy about Murphy's issues with Hudgins. Murphy has communicated to Quinones that Hudgins makes her uncomfortable. Quinones observed that the conflict between Murphy and Hudgins has persisted since Quinones' assignment to FAB and noted that at times the conflict appeared targeted. Quinones emphasized that she has never solicited coworkers to participate in the ongoing investigation but has encouraged those who confide in her to "tell their truth." Murphy reportedly asked Quinones if anyone else had inquired about any issues Quinones might have with Hudgins.

Quinones has heard various rumors and "water cooler talk" regarding Hudgins' allegedly inappropriate behavior and the ongoing investigation but stressed that she has not sought out such information and does not know the veracity of the allegations.

Quinones stated that she is not aware of Hudgins speaking with Murphy in the FAB smoking area but acknowledged that personal conversations often take place outside. She explained that the FAB building has an open layout, with only executive offices having four walls, which makes private conversations uncommon.

Finally, Quinones summarized that Hudgins can behave in a manner that is "a little too friendly... sometimes."

**Findings**

The complaints against Hudgins are serious and concerning, particularly given his title and rank within the Philadelphia Fire Department. The allegations include claims that he regularly hugged female employees in a manner that made them feel uncomfortable and placed them in a position where they felt unable to reject his advances. This fear and uncertainty stemmed from Hudgins's authority and influence within the department.

While the primary concern among many complainants was Hudgins's physical contact, specifically hugging, reports of additional patterns of inappropriate behavior toward female employees emerged during the investigation. Before addressing those broader issues, it is important to describe the nature of the interactions that were often characterized as "creepy" by the complainants.

<u>Consolidated Facts About Physical Contact in the Workplace</u>

Several individuals reported that Hudgins had a habit of hugging, which they often did not decline. However, when they attempted to avoid the hug, or tried to side-hug or give a one-armed hug, Hudgins would reportedly make comments such as, "We don't hug that way," or "Give me a real hug." The general consensus among witnesses who reported this conduct was that Hudgins's behavior in this regard was, for lack of a better term, unsettling.

When asked about Hudgins's conduct, both his aide and Battalion Chief Bowmer referenced the department's culture, describing it as having a family-like dynamic. According to them, hugging was common and often perceived as a friendly or familial gesture. Hudgins himself stated that he hugged employees with whom he had a more cordial or familial relationship, and that he had no

ill intent or sexual motivation. He claimed that he hugged not only some female employees but also gave handshakes and hugs to male colleagues as well.

The investigators note that while hugging may be appropriate in some professional settings, particularly during moments of grief or celebration, employees, especially those in subordinate roles, may find it uncomfortable or inappropriate when a clear power imbalance exists.

Although the primary complaint centers on reports that Hudgins' hugging of female employees made them uncomfortable, there was one other instance of alleged inappropriate physical contact. Jordan recalled a 2022 incident during which she alleged Hudgins inappropriately touched or grazed her breast while attempting to adjust her cardigan and said, "I'm still a man." Jordan did not ask for assistance with her sweater; Hudgins took it upon himself to touch her and allegedly made the inappropriate comment.

Hudgins denied making any inappropriate comment to Jordan. He recalled that then-Commissioner Murphy informed him that Jordan had complained about an interaction with Hudgins, though he did not provide specific details. Hudgins stated that he later spoke with Jordan and apologized for any behavior that may have made her feel uncomfortable.

During her interview, Jordan recalled reporting Hudgins' misconduct to Murphy but simply stated during her interview that she told then-Commissioner Murphy about the incident. Jordan did not provide details of her conversation with then-Commissioner Murphy. during this investigation. Jordan reported that she declined then-Commissioner Murphy's offer to escalate the complaint and expressed satisfaction with then-Commissioner Murphy's assurance that he would speak with Hudgins. Commissioner Murphy did not recall the details of Jordan's complaint, but he remembered that he offered her the opportunity to investigate the complaint and Jordan declined. Murphy confirmed that he spoke with Hudgins about Jordan's issue. Jordan did not have any issue with Hudgins after she complained to Murphy.

There appears to be limited ground for formal findings related to that specific incident considering the passage of time between the incident and the current investigation, Jordan's decision not to pursue the matter further, and her representation that she did not have any issue with Hudgins after she complained to Commissioner Murphy. However, Jordan's account contributes to the broader assessment of whether Hudgins has demonstrated a pattern of inappropriate behavior toward female employees, both uniformed and civilian, within the department.

Consolidated Facts About Inappropriate Comments in the Workplace

In addition to complaints about Hudgins's unwelcome hugs and the specific incident of unwelcome contact, several witnesses recalled Hudgins making offensive comments. For example, former employee Marian Farris recalled Hudgins commenting on her weight loss, stating that she looked good, and touching her hair whenever she had a new hairstyle. Farris noted that the HR Director, her supervisor, was present when Hudgins commented on her weight loss. According to Farris, the female Director also remarked on her appearance.

When asked whether he had commented on Farris's weight loss, Hudgins admitted that he had and also in the presence of the HR Director. He stated that he had no ill intent or sexual motive behind the comment and believed he was offering a compliment. He also acknowledged that he occasionally spoke with Farris about her hair and that she often showed off her new hairstyles in the office, inviting him to take a closer look or touch the style. He denied ever touching Farris without her permission.

Mitchell recalled a conversation during her first meeting with Hudgins regarding her assigned duty at the Academy. She alleged that, during the conversation, Hudgins asked why she was still assigned to the Academy, given that her maternity leave had ended. He noted that there were breastfeeding pods available for nursing mothers at fire stations and said that she should not be taking advantage of the special duty assignment at the Academy if she no longer needed it. Mitchell found this comment offensive and further alleged that Hudgins made generalizing statements about pregnant women in the department, implying that they attempted to extend special duty assignments beyond the necessary period of their maternity leave. Mitchell reported to her supervisor Chief Richey that Hudgins disregarded the chain of command by speaking to her directly. According to Richey, Mitchell did not tell him that Hudgins was inappropriate during the conversation. Consenza recalled the conversation between Mitchell and Hudgins and could not recall any time they were alone. Mitchell's account of the conversation differs from that of Hudgins, Consenza and Richey. Therefore, absent making credibility findings, it is impossible to determine what truly happened or whether Hudgins made inappropriate comments about pregnant employees or nursing mothers.

In addition to Mitchell's allegations, Boyle reported that Hudgins made inappropriate comments about female bodies. She alleged that he discussed which body types within the department he found attractive and which he did not. For example, Boyle recalled an alleged comment in which Hudgins said he did not like the breasts of Dana Jackson.

Boyle further alleged that Hudgins had open conversations with her and her wife, Murphy, in which he expressed a desire to see the two women being sexually intimate with each other, with his wife, and to engage in a threesome. She also stated that he shared personal details about shaving his wife's pubic hair. Additionally, Boyle claimed Hudgins showed her and Murphy pictures of an island he liked to visit and commented on how the people there "worshiped Black men."

The only witness to these conversations between Hudgins and Boyle was her wife, Murphy. No other witness recalled Hudgins openly discussing sexual activities involving his wife, expressing a desire to engage in sexual activity with other women, or referencing an island where Black men were worshiped. Murphy and Boyle also recalled Hudgins referring to them as "Chuck and Larry," which is a reference to a movie in which two male actors portray firefighters who get married for health insurance. Hudgins acknowledged that the comment was made during a conversation but denied being the one who commented. Murphy alleged that Chief Bowmer also made the comment, but she brushed it off as a joke because she likes Bowmer and did not find him creepy. According to Consenza, Boyle stated that she and Murphy were getting married for the health benefits because Boyle intended to return to school and take a leave from work. According to Consenza, the marriage between Boyle and Murphy is exactly a "Chuck and Larry" like arrangement.

It is worth noting that McCrory recalled an incident in 2018 when she overheard an open conversation involving Hudgins, during which he stated that he shaved his wife's pubic hair. Boyle was unable to provide a specific timeline for the comment about Hudgins shaving his wife, which leads investigators to conclude that, if such a comment was made openly in the workplace, it most likely occurred in 2018. It is also notable that it was never reported until now.

Hudgins outright denied ever making sexual comments about or toward female employees in the department. He specifically denied ever alluding to liking or disliking Jackson's breasts. He also denied telling Boyle and Murphy that he wanted to see them be intimate with each other, with his wife, or with him. Additionally, he denied ever speaking about his wife in the workplace, especially in an inappropriate manner. According to Hudgins, he has the utmost respect for his wife and would never discuss their private life in a professional setting.

Except for the 2018 alleged comment regarding Hudgins's wife, the only witnesses to Hudgins's alleged sexual comments were Boyle and Murphy, who both stated that these conversations took place in the smoking area. Quinones was asked during the investigation whether she had ever seen Hudgins in the smoking area, as it was a location she frequented and where she would occasionally see Murphy. However, Quinones stated that she had not personally witnessed any conversations between Murphy, Boyle, and Hudgins.

Quinones did note that it is possible for conversations to have occurred in the smoking area, because although she was unaware of whether Hudgins smokes, the parking lot for employees is adjacent to that area. Despite Quinones' statement that it is possible for Hudgins to have conversations with Boyle and Murphy, it remains that no other complainant or witness in this investigation could corroborate the alleged sexual comments made by Hudgins. Furthermore, no additional complainant or witness recalled any conversations or instances of Hudgins speaking sexually in the workplace.

Notably, his aide, Cosenza, stated that she is with Hudgins at all times, as she provides him with administrative assistance and other support, including transportation throughout the city. Cosenza reported that she has never heard Hudgins speak sexually in the workplace or speak about his sexual relationship with his wife or any other woman. Likewise, Bowmer, Richey, Quinones and Morgan all denied ever observing Hudgins act inappropriately towards employees in the workplace. These witness admitted that they may have heard rumors in the office or heard directly from Jacqulyn Murphy about her alleged experience with Hudgins but could not confirm the whether the information was true.

<u>Consolidated Facts About Management Style Complaints</u>

The remainder of the complaints in this investigation relate to Hudgins' management style and the employees' disagreements with his oversight. Employees such as Bradshaw, who experienced a side of Hudgins that she perceived as unrelenting in his adherence to department policy, took issue with what they viewed as unfair treatment or denial of their requests. For example, Bradshaw alleged that Hudgins forced the department's doctor to medically clear her for work while she was still injured. However, there is no additional evidence to support this claim, and it is understood

that Bradshaw is still receiving workers' compensation, which is managed by attorneys employed by the city.

Similarly, Jackson had concerns about Hudgins' demeanor in the workplace and their disagreements over internal departmental issues. Mitchell believed her position at the Academy was in jeopardy due to Hudgins' comments suggesting she no longer required the special assignment that had been granted to her during her pregnancy. Additionally, Boyle alleged that Hudgins unreasonably denied her request for unpaid leave to continue her education, and that he used his rank and authority to deny requests that, according to her union, had been granted to others in the past.

Hudgins responded to these general workplace disagreements by stating that he was simply doing his job. He acknowledged that both Jackson and Boyle disagreed with some of the decisions but emphasized that these decisions were not made by him alone. Many of them were ultimately the final decisions of Commissioner Thompson. However, due to the hierarchy and operations of the department, Hudgins was often the individual delivering the message. It appears that the portion of the complaint involving workplace disputes may largely be a case of individuals directing their frustrations at the messenger. These issues with Hudgins' performance as a supervisor and his enforcement of policy appear to be an exercise of managerial discretion and not discriminatory.

<u>Concerns About Witness Credibility/Overtime Abuse Investigation</u>

The primary complainants in the investigation are Boyle and Murphy, married paramedics in the Philadelphia Fire Department, who reported experiencing harassment and retaliation from Hudgins. Boyle detailed instances of inappropriate comments, sexual advances, and professional retaliation, including the denial of a leave of absence request. Murphy described years of unsolicited physical advances, sexual comments, and a biased overtime investigation, all of which allegedly escalated after she married Boyle.

On its face, these allegations against Hudgins are serious and egregious. However, the backstory behind these previously friendly relationships is important. During the investigation, it was revealed that Murphy, Boyle, and Hudgins were once friendly. Murphy admitted to having a cordial relationship with Hudgins and, for years, their interactions, including hugs, did not make her uncomfortable. According to Murphy and Boyle, Hudgins' behavior and emphasis on his rank and authority became more pronounced as he continued to be promoted, culminating in his current position as second in command.

The friendly nature of their relationship with Hudgins was corroborated by Boyle's former friend and Hudgins's aide, Cosenza. Cosenza shared with investigators a text exchange between her and Murphy, in which Murphy sent her a picture of Hudgins with Murphy's son when he was an infant. In the photo, the child is in a car seat placed on top of Hudgins' desk while Hudgins is seated behind the desk working. Murphy sent this message to Cosenza in August 2024.

The timeline is critical in this matter because it appears that, until the fall of 2024, there were no reported issues between Murphy, Boyle, and Hudgins. According to Hudgins, he became aware of a potential misuse of overtime hours after reviewing data on an open-source website that reports

payroll information for all City of Philadelphia employees. This information was brought to his attention by another Fire Department employee who sent him a link with a vague message stating, "Look at this."

Hudgins stated that he reviewed the website and noticed several administrative employees at the fire administration building were earning excessive overtime pay. He questioned how these staff members, who worked a standard Monday through Friday schedule, could significantly increase their base salaries through overtime. In his preliminary review, Hudgins identified Murphy and Preston as two such employees. He became suspicious that payroll supervisor Marian Farris may have been approving overtime without proper documentation.

Hudgins stated that he informed fellow Deputy Commissioners of his concerns and also told Murphy and Preston directly that he was reviewing their overtime usage. Although he could not recall the exact dates, he indicated that these conversations occurred in early fall 2024. Shortly thereafter, in November 2024, a complaint was submitted by the union to DiFrancesco.

Although this investigation did not include a detailed review of the overtime records provided by Hudgins, the connection between the harassment complaints and the overtime investigation raises serious concerns about motive and credibility. Murphy earned significant overtime pay, a fact she admitted during her interview, and was aware that Hudgins was confirming the legitimacy of her overtime hours. The complaints giving rise to this instant investigation were filed shortly after Hudgins informed Murphy and Preston of his overtime investigation. Farris was also suspicious of Hudgins' request for payroll records. The timeline of events is significant, particularly given Hudgins' belief that the complaint was filed in retaliation for his overtime investigation. It was reported during this investigation that Murphy voluntarily told Morgan that she was having issues with Hudgins and that a complaint was filed. Additionally, a common theme that emerged during the investigation is the notion that rumors have circulated throughout the department, and on social media, which include allegations that Murphy was soliciting complainants. This suggests a possible motive to undermine Hudgins' overtime investigation and an attempt to have him removed from his position.

This finding is further supported by an incident observed by Cosenza in or around September 2024, during which she saw Murphy crying outside the administration building. According to Cosenza, Boyle made a threatening remark, stating that Hudgins was "going down" and that Cosenza should have a backup plan. Cosenza could not attribute this behavior to anything other than the overtime investigation, as Hudgins had recently disclosed that he was looking into overtime usage within the department. Cosenza, who played a central role in the overtime review by requesting and analyzing payroll documents on behalf of Hudgins, confirmed that he relied heavily on her due to his busy schedule.

There is no plausible explanation offered during this investigation that disconnects the timeline of Hudgins' overtime probe from the subsequent complaints. The alleged interactions between Hudgins, Murphy, and Boyle are undermined by the ongoing investigation, and the claims related to sexual comments lack corroboration. Additionally, there is concern that Murphy actively solicited complaints against Hudgins by reaching out to department members to ask whether they had any negative interactions with him. It was confirmed that Murphy contacted Amanda Mitchell

to ask if she had experienced anything inappropriate with Hudgins and encouraged her to file a complaint. Cosenza also heard that Quinones had reached out to female employees in the department to gather complaints, though Quinones denied this.

Conclusion and Recommendations

The recognition of a questionable timeline and possible retaliatory motive does not excuse or minimize concerns regarding Hudgins' tendency to hug employees and his apparent lack of awareness that such physical contact may be unwelcome, particularly from someone in a position of power. The incident involving Jordan in 2022 was addressed by former Commissioner Murphy and is not a significant focus of this investigation. Similarly, the alleged 2018 comment Hudgins made regarding his wife's pubic hair, which was allegedly overheard by McCrory, is dated, and any recent comment is uncorroborated.

Removing the unsubstantiated allegations brought by a married couple, one of whom is currently under investigation for serial overtime fraud, leaves the primary concern that Hudgins has a habit of hugging employees and enforcing policies that are sometimes unpopular.

Given that the remainder of the allegations against Hudgins are either too remote in time or appear to have been motivated by his oversight of the overtime abuse scandal, it is recommended that Hudgins be returned to work. However, his reinstatement should come with conditions because there is concern that his overly friendly demeanor has made several female employees feel uncomfortable.

Hudgins is a high-ranking supervisor and must be reminded that it is a serious matter to make physical contact with employees or comment on employees' physical appearance, even if such gestures are intended to be complimentary. The touching referenced during this investigation was described as hugs prompted by Hudgins without regard for whether the complainant welcomed the embrace.

The following three recommendations follow these findings:

- It is recommended that corrective action should include a formal warning that similar complaints of inappropriate hugs or sexual comments could lead to termination. It is of note that this investigation was the first reports about Hudgins' alleged misconduct since serving as a Deputy Commissioner and the primary reporters lack some credibility; however, a pattern of similar behavior must not be overlooked.

- It is also recommended that the City schedule mandatory harassment training for Hudgins focusing on workplace boundaries and appropriate professional conduct of a supervisor. Hudgins must also be informed of the consequences should it be reported that he is engaging in retaliation towards any individual who participated in this investigation.

- To the extent feasible, the Department should consider mandating a policy that discourages the Commissioner, Deputy Commissioner, or other high-ranking official from meeting with employees alone, and that the aide serving individuals in this position should be present in

meetings when possible. Doing so will serve as a level of protection for all parties. The aide/observer must maintain the confidentiality of any meeting.

- While the investigators are not fully familiar with the complete scope of training programs offered by ERU, it is recommended that ERU enroll Hudgins in sexual harassment prevention training, specifically addressing supervisory responsibilities and the obligation to maintain professional boundaries with subordinate employees.

Lastly, those interviewed as a part of this investigation should also receive notice, guidance, and support, considering many are apprehensive about Hudgins' return to work.